WESTERN AND ATLANTIC RAILROAD COMPANY *v.* OHIO VALLEY BANKING AND TRUST COMPANY.

1. The rights of a bona fide holder, for value and without notice, of a bill of lading which stipulates for the delivery of the goods to the shipper's order, at a designated point, with direction to notify A., will not be affected by a prior agreement or custom among the consignor, A., and the carrier, to the effect that A., without the production of the bill of lading, should have the right to change the destination of the goods.

2. If the carrier, in pursuance of such an agreement or custom, under the instruction of A., and without authority from such holder, stops the goods at an intermediate point and there stores them in its warehouse, where they are levied upon as the property of the consignor, under an attachment sued out against him by A., such seizure will not relieve the carrier from liability for its failure to deliver the goods upon the demand of the holder of the bill of lading.

Argued December 16, 1898. — Decided July 19, 1899.

Action for damages. Before Judge Reid. City court of Atlanta. June 28, 1898.

This was a suit against the railroad company for the wrongful conversion of four cars of bulk corn. By consent the case was tried by the judge without the intervention of a jury. A judgment was rendered in favor of the plaintiff. The defendant made a motion for a new trial, the first three grounds of which were that the judgment was contrary to the law and the evidence. The fourth ground was as follows: "The judgment is contrary to this principle of law, to wit: A bill of lading is not such a negotiable instrument as to give the assignee any other or greater rights than the assignor had; hence the assignee (plaintiff herein) took the bills of lading subject to any agreements which had been entered into between the assignor and the common carrier, provided such agreement did not vary any material representation in the bills of lading upon the faith of which the assignee bought them." The fifth ground was, "The judgment is contrary to this principle of law, to wit: Where an attachment has issued from a court of competent jurisdiction against a non-resident defendant, and a levy is made by the sheriff upon goods in the hands of the common carrier, which are the property of the non-resident defendant so far as the carrier knows, this will constitute a good defense

on the part of the carrier for the non-delivery of the goods when demanded by the true owner, even though the non-resident defendant is no longer the owner of the goods; they being at the time in the custody of the law, there is no conversion."

The evidence submitted on the trial was substantially as follows: On March 3, 1896, the Louisville & Nashville Railroad Co. issued to A. Waller & Co., of Henderson, Ky., its two bills of lading acknowledging the receipt from them of two cars of bulk corn, each shipped from a local station near Henderson and destined to Charleston, S. C. On March 9, 1896, the same railroad company issued two other bills of lading to the same consignors, likewise for cars of bulk corn, shipped from the same locality and destined to Charleston, S. C. All of these bills of lading acknowledged the receipt from A. Waller & Co. of this bulk corn, provided for its delivery at Charleston, S. C., directed its shipment via the Western & Atlantic Railroad at Chattanooga, recited that the freight on each car had been prepaid to Charleston, and stipulated that the corn was to be delivered to "shipper's order, notify Atlanta Grocery Co., Charleston, S. C." The bills of lading contained the numbers of the cars in which the corn was shipped. On March 4, 1896, the Ohio Valley Banking & Trust Co. discounted two drafts of A. Waller & Co. on the Atlanta Grocery Co., to which were attached, respectively, the two bills of lading issued on March 3, 1896. On March 10, 1896, it discounted two other drafts for the same firm on the Atlanta Grocery Co., to which were attached, respectively, the two bills of lading issued on March 9, 1896. Each of the bills of lading was, at the time the drafts were discounted, indorsed in blank by A. Waller & Co., and each of them stated that it was drawn against the car of corn covered by the attached bill of lading. The Ohio Valley Banking & Trust Co. has controlled the possession of the bills of lading and the drafts since discounting the latter. The proceeds of the four drafts were placed to the credit of A. Waller & Co. by the Ohio Valley Banking & Trust Co. at the time they were discounted, and were checked out by them. The banking company has owned the bills of lading ever since and has been "out" the several amounts named in the drafts from the dates

33

of their discount.   In the course of a few days after shipment, the cars of corn were delivered to the Western & Atlantic Railroad Co., at Chattanooga, and by it transported to Atlanta, where they duly arrived, under seal, with the corn, in bulk, in the cars.   The way-bills received by the Western & Atlantic Railroad Co. with the corn correctly recited the destination, shipping and delivery orders, and the prepayment of freight, as set forth in the bills of lading.   While the cars of corn were in Atlanta, the Western & Atlantic Railroad Co., without the production of the bills of lading or the payment of any of the drafts by the Atlanta Grocery Co., and with no authority save the instructions of the Atlanta Grocery Co., stopped the shipments in transit, broke the seals from each of the cars, allowed the corn to be sacked by the Atlanta Grocery Co., and had the corn hauled from the cars and stored in a warehouse of the Western & Atlantic Railroad Co., in Atlanta.   The corn was stopped in Atlanta by the Western & Atlantic Railroad Co. under a parol agreement, or a custom, existing among the Atlanta Grocery Co., A. Waller & Co., and the Western & Atlantic Railroad Co., to the effect that the Atlanta Grocery Co. should have the right to change to any intermediate point, or stop at Atlanta, all shipments of corn ordered by it from Waller & Co.   There was nothing as to this agreement or custom recited in the bills of lading, and there was no evidence that the banking company had any notice thereof, or in anywise consented to or acquiesced therein.

After the corn had remained in the warehouse from about the middle of March until the 7th of May, 1896, it was on that day levied upon by the sheriff of Fulton county, under an attachment sued out by the Atlanta Grocery Co. against A. Waller & Co.   The sheriff permitted the corn to remain in the warehouse where it was stored, the agent of the Western & Atlantic Railroad Co. giving him a receipt for the same.   On May 18, 1896, the Ohio Valley Banking & Trust Co., through its attorneys, made a demand on the general freight agent of the Western & Atlantic Railroad Co., in Atlanta, for the four cars of corn in controversy, which demand was refused on account of the pending levy under the attachment.   On July

10, 1896, the sheriff dismissed his levy under the attachment, reciting in his entry that evidence had been produced to him that the property did not belong to Waller & Co., and that the Atlanta Grocery Co. refusing to indemnify him, he refused to sell and dismissed the levy. After the levy was dismissed, defendant's agent offered to deliver the corn to the plaintiff's attorneys, which offer the plaintiff refused. The drafts, with the bill of lading attached, were sent forward for collection, but payment was refused by the Atlanta Grocery Co., and none of them were ever paid. The corn never reached Charleston, but remained in the defendant's warehouse in Atlanta until sold by the defendant as unclaimed freight. The value of the corn was shown to be in excess of the aggregate amount of the four drafts, and the judgment rendered by the court was for the sum of the four drafts as principal, and the accrued interest.

*Payne & Tye*, for plaintiff in error.
*King & Spalding*, contra.

FISH, J. In the absence of the agreement or custom existing among Waller & Co., the Atlanta Grocery Co., and the Western & Atlantic Railroad Co., the defendant, prior to the issuance of the bills of lading by the Louisville & Nashville Railroad Co., the initial line, it was the duty of the defendant, under the terms of the bills of lading and the way-bills it received with the corn, to safely transport the corn from Chattanooga to Atlanta within a reasonable time, and deliver it at the latter place to the connecting line en route to Charleston, there to be delivered to the order of the consignors. While the Ohio Banking & Trust Co., the plaintiff, as transferee of the bills of lading, having a special property in the corn as security for the payment of the drafts on the Atlanta Grocery Co., which it had discounted, had the right, subject to the defendant's claim for the difference in freight, to change the destination of the corn and have it stopped in Atlanta, the Atlanta Grocery Co., which the bills of lading and the way-bills plainly indicated was not the consignee or owner of the corn, had no such authority. 5 Am. & Eng. Enc. L. 214, 215. What effect did the agreement or custom existing among the consign-

ors, the Atlanta Grocery Co., and the defendant, that the Atlanta Grocery Co. could, without producing the bills of lading, stop the corn in Atlanta, have upon the rights of the plaintiff, which was a bona fide holder of the bills of lading, for value, and without notice of such agreement or custom? In National Bank *v.* Atlanta & Charlotte Railway Co., 25 S. C. 216, it was held that where time drafts, accompanied by indorsed bills of lading of cotton, were cashed by a bank, any arrangement between the drawee of the drafts and the shipper, unknown to the bank, that the cotton should be delivered to the drawee without the production of the bills of lading, would be a fraud on the bank, and would not excuse an improper delivery by the carrier to such drawee. The case of North Pennsylvania Railroad Co. *v.* Commercial Bank, 123 U. S. 727, was an action by the assignee of certain freight receipts for cattle shipped, to recover damages of the carrier for a misdelivery. The only defense was, that the cattle had been delivered to the party whom the carrier had been instructed to notify of their arrival, although such party presented no bill of lading or freight receipt. It was further claimed that such delivery was according to the custom and course of business of the parties. But it not appearing that this custom was known to the holder of the receipts or bill of lading, it was held that the delivery set up was not a defense. "A delivery by the carrier upon the production of an unindorsed bill of lading will not be excused merely upon proof of a custom to deliver without an indorsement, unless it can be clearly shown that the party thereby damaged was aware of the custom and acted with knowledge of it." 5 Am. & Eng. Enc. L. (2d ed.) 209, and cases cited in n. 3. It seems that the principle laid down by these authorities, to the effect that the rights of one who is a bona fide holder of a bill of lading, and without notice, will not be affected by a delivery of the goods to the person to be notified of their arrival, without the production of the bill of lading, and in pursuance of an agreement between such person and the consignor, or of a custom existing among the parties, sustains the position that the rights of the plaintiff in this case as against the defendant were not affected by the arrangement or custom,

unknown to plaintiff, that the Atlanta Grocery Co., without the production of the bills of lading, should have the right to change the destination of the goods.

One of the common uses of bills of lading is to enable sellers of goods to obtain advances upon their shipments by drawing on the purchasers for the price of the goods, attaching the bill of lading to the draft, and having the draft discounted by some bank, which holds the bill of lading and relies upon its terms as security for the payment of the draft. The carrier must have knowledge that the bill of lading may be so used and thus get into the hands of a bona fide holder, and is bound to see that the goods are not delivered until the draft is paid and the bill of lading produced. To permit the rights of a bank, in good faith and without notice, discounting a draft with a bill of lading attached, and relying on the terms of the bill of lading as security, to be affected by an existing arrangement or custom among the consignor, the purchaser or person to be notified of arrival, and the carrier, that goods should be delivered to the purchaser or person to be notified, or that he should have the right to change their destination, without payment of the draft and production of the bill of lading, would be a gross fraud upon the bank, and manifestly result in preventing shippers getting advances on goods sold, by drawing for the purchase-price, attaching draft to bill of lading, and having same discounted. It may be that the judge below, who tried this case without a jury, while admitting the evidence as to the agreement or custom mentioned, did not consider it when he came to render his judgment, but decided the case as if no such agreement or custom had been proved. The evidence admitted upon this subject was clearly incompetent. The general rule is, that a bill of lading, as a contract expressing the terms and conditions upon which the property is to be transported, is to be regarded as the sole evidence of the final agreement in which are merged all prior and contemporaneous agreements of the parties, and, in the absence of fraud or mistake, its terms or legal effect, when free from ambiguity, can not be explained, added to, or contradicted by parol. 4 Am. & Eng. Enc. L. 536. Nor is evidence of usage admissible to

control, vary, or contradict the positive stipulations of a bill of lading. Ib. 545.

The liability of a common carrier ceases if the goods are taken from his possession by legal process (*Savannah R. Co.* v. *Wilcox, Gibbs & Co.*, 48 *Ga.* 432), but in order that such a seizure may excuse him, it must have been made without laches, connivance, or collusion on his part. Hutch. Car. §4916. In the present case the defendant, without any legal authority for so doing, stopped the four cars of bulk corn, which were en route to Charleston, in Atlanta, permitted the Atlanta Grocery Co. to have the corn sacked, and then stored it in its own warehouse in Atlanta, where it remained for nearly two months, and was then levied upon as the property of Waller & Co., under an attachment sued out against that firm by the Atlanta Grocery Co. But for the wrongful stoppage and storage of the corn in Atlanta by the defendant, it is quite certain that it would not have been seized by the sheriff, and the defendant should not be permitted to plead, as an excuse for its failure to deliver it upon the plaintiff's demand, a seizure which was brought about in consequence of its own unauthorized and wrongful act. The judgment of the court was demanded under the law and the facts. *Judgment affirmed. All the Justices concurring.*