## ATLANTA NAT. BANK v. SOUTHERN RY. CO.

(Circuit Court, N. D. Georgia. January 23, 1901.)

1. CARRIERS OF GOODS—THROUGH SHIPMENTS—CONNECTING CARRIERS.

   A railroad company received cotton for shipment, for which it issued through bills of lading providing for the transportation of the cotton to Norfolk. Va., via the Bell Street Compress, Atlanta, Ga. The company did not route the cotton by such bills beyond its own line, which terminated at Atlanta. On reaching Atlanta the cars containing the cotton were delivered to defendant railroad company, together with transfer slips for their transfer to the compress, to which defendant owned the only track, and they were delivered at the compress; defendant receiving a transfer fee of one dollar per car for their trackage. Defendant owned and operated the compress, and also one of four competing railroad lines between Atlanta and Norfolk, but no waybills for the cotton were delivered to it with the cars, as was the universal custom when it was intended to route goods over another road as a connecting carrier on a through shipment; nor was it in fact the intention of the initial carrier to route the cotton over defendant's road to Norfolk. *Held*, that defendant did not receive the cotton as a connecting carrier under the bills of lading, but merely received the cars as a transfer company, and that its liability as a carrier ceased upon the safe delivery of such cars and their contents to the compress; nor did the fact that defendant owned and operated the compress render the delivery of the cotton to its agents in charge of such compress for compression while in transit under the bills of lading, together with manifests which were substantial copies of the bills of lading, a delivery to defendant as a carrier,—it appearing from the evidence that the first carrier retained the right to route the cotton out, after its compression, over any other road.

2. SAME—STOPPAGE OF COTTON IN TRANSIT FOR COMPRESSION—RELATION AND LIABILITY OF COMPRESS COMPANY.

   Under the rules and regulations governing the transportation of cotton by the Southern railroads, cotton shipped from interior points to the seaboard upon through bills of lading is permitted to be stopped while in transit for compression; such compression being regarded as necessary to its transportation by rail. *Held*, that a compress through which cotton so shipped was billed for compression became a link in the route of transportation, and that, in view of such relation, the owner of such compress, on receiving the cotton, accompanied by manifests which were substantial copies of the bills of lading, showing the destination of the cotton and that it was to be there delivered to "order notify," took the same

charged with notice of the rights of the holder of such bills of lading, and with the duty of making delivery only in accordance with their terms, and became liable to such holder for conversion, where, without his knowledge or authority, or the production of such bills of lading, it delivered the cotton to the consignors.

8. SAME.

The owner of a compress, to which cotton is delivered for compression while in course of transportation, is not subject to greater or different liability on account of an alleged misdelivery of such cotton because of the fact that it is a railroad company, where it bears no relation to such cotton as a carrier.

4. PLEADING—SUFFICIENCY OF PETITION—GEORGIA CODE.

Under the Code of Georgia, which abolishes forms of action and simply requires the plaintiff to set forth in his petition the facts which constitute his cause of action, a petition in an action by the holder of bills of lading to recover the value of the goods represented thereby is sufficient to sustain a recovery, where it alleges facts which raised a duty on the part of defendant to deliver such goods, which were in its possession, only in accordance with the terms of such bills of lading, and shows a breach of such duty by their delivery to another, by reason of which they were lost to plaintiff; and it is not material whether such petition be regarded as one in assumpsit on the contract or for conversion.

Action to recover the value of certain cotton alleged to have been misdelivered and converted by defendant, in violation of the rights of plaintiff as owner by virtue of bills of lading therefor.

Abbott, Cox & Abbott, for plaintiff.

Dorsey, Brewster & Howell and Sanders McDaniel, for defendant.

NEWMAN, District Judge. This was a case brought by the plaintiff against the defendant for the wrongful delivery by the latter of certain lots of cotton at a compress in Atlanta, called the "Bell Street Compress," owned and operated by the defendant company. The following report of the auditor gives the statement of the case and his findings of fact and conclusions:

"The above-stated case was referred to me as auditor on June 2, 1899, with directions to hear and determine all questions of law and fact therein, and report the evidence and my conclusions to the court, subject to further consideration and revision; both parties reserving the right to except to the report as to any matter of law or fact, and also the right to except to rulings on the admission or exclusion of evidence, and exceptions to be filed within 30 days after filing of the report. This was a consent reference, and the auditor was directed to speed the hearing, and in pursuance of such directions, as soon as the record reached me, I summoned counsel for the parties before me, who requested that the hearing be had at such times and intervals between engagements in court as would suit the convenience of counsel for both parties; and pursuant to this request I heard the case from time to time at the convenience of counsel, and did not complete the hearing until May 12th, since which date I have carefully considered the evidence, which is voluminous, and the many questions of doubtful and difficult law applicable thereto, and after a full and careful consideration I now beg to make this report of the evidence and my conclusions of the law controlling the case:

. "Statement of the Case.

"The suit was originally brought by attachment in the city court of Atlanta, the attachment being executed by service of summons of garnishment on the Fourth National Bank of Atlanta and the Capital City Bank of Atlanta, which summonses of garnishment were answered by the garnishees; each admitting indebtedness in amounts more than enough to pay the debt sued for. The

declaration in attachment was filed in the city court, which sets forth plaintiff's cause of action by petition and in paragraphs as provided by the statutes of this state. Afterwards the defendant, being a foreign corporation, removed the case to this court, and the record was duly filed, containing, in addition to the attachment and declaration in attachment and garnishments issued in the case, the bond given by the defendant corporation dissolving the garnishments. The suit is brought by the plaintiff against the defendant to recover the value of a large amount of cotton which it is alleged the defendant received under and by virtue of through bills of lading requiring it to transport said cotton to Norfolk, Va., and there to deliver it to 'order notify Hamilton, Gibson & Leake.' The bills of lading covering the cotton directed that said cotton should be transported to Norfolk, Va., via the Bell Street Compress, Atlanta, Ga. The petition alleges that the plaintiff is the holder bona fide and for value of all of said bills of lading, and was therefore the owner of the cotton represented by said bills of lading; that it had received these bills of lading in regular course of business as collateral security for a note made by Hamilton, Gibson & Leake. It further sets out that the defendant failed to transport said cotton, as provided by said bills of lading, to Norfolk, Va., but, on the contrary, delivered all of said cotton at the Bell Street Compress, in the city of Atlanta, to Hamilton, Gibson & Leake, without requiring the production of the bills of lading, and in violation of the terms of said bills of lading, which required that said cotton should be delivered at Norfolk to 'order notify.' Petitioner further alleges that the Bell Street Compress, in the city of Atlanta, at the time of such wrongful delivery of said cotton to Hamilton, Gibson & Leake, was owned and operated by the defendant, the Southern Railway Company. The petition alleges that the defendant, by accepting said cotton, was bound by the terms of said bills of lading, and contracted as a common carrier to safely transport and deliver said cotton at its destination, to order of consignors, according to the tenor of said bills of lading and the indorsements on the same; but the defendant, not regarding its duty in that behalf, neglected and failed to transport and deliver said cotton according to its contract, but, on the contrary, wrongfully delivered said cotton at Atlanta, Ga., to Hamilton, Gibson & Leake, without the knowledge of petitioner, and without its consent, and without the production of said bills of lading so held by the petitioner, and that by reason of the failure of defendant to so transport, and deliver said cotton to petitioner, according to the bills of lading, said defendant has injured and damaged plaintiff in the sum of $12,952.37, besides interest from April 1, 1898, and all accruing interest at 8 per cent. until paid, being the balance due on the debt to secure which said bills of lading were duly transferred to the plaintiff. The defendant filed a demurrer in said cause, which was, however, not insisted on before me, and also a plea and answer, in which it denied its liability as a carrier on account of said bills of lading, denied that it had received the cotton as a common carrier, and denied its liability either as a common carrier or in any other capacity. This is a general statement of the issues made by the pleadings. There are no controverted facts in the case, and the issues of law made and argued before me were as follows: Plaintiff insists—First, that defendant is liable to it as the holder of said bills of lading, and by their terms, for said cotton, as a common carrier, having received the same as such from the Western & Atlantic Railroad in the city of Atlanta; and, secondly, that, if it is not liable as a common carrier, the defendant is liable as a warehouseman, being the owner and controller and operator of the Bell Street Compress, where said cotton was received by it or its agents, and where it was converted by the wrongful delivery to Hamilton, Gibson & Leake. The defendant denies its liability in either capacity.

### "Facts in the Case.

"As before stated, there are no issues of fact presented to the auditor. The oral and documentary evidence is voluminous; but, when considered, it will be seen that all the material and substantial facts in the case are not in dispute, but are admitted by the defendant. The facts material to a proper consideration and determination of the questions of law are herewith found by me as follows:

106 F.—40

"Plaintiff was a bona fide holder for value of the bills of lading introduced in evidence at the time the suit was filed in the city court by it, and at the time the cotton was delivered to the Bell Street Compress in the city of Atlanta. It had received the bills of lading as collateral security from Hamilton, Gibson & Leake to secure the payment of a note for $30,000, made to the plaintiff by said Hamilton, Gibson & Leake, dated October 1, 1897, and due on demand. A large amount of the cotton was found still in the Bell Street Compress, and was sold by consent, and the proceeds credited on said note held by the plaintiff, reducing the amount to the sum sued for. Fifteen of said bills of lading were issued by the Atlanta, Knoxville & Northern Railway. Two of said bills of lading were issued by the Nashville, Chattanooga & St. Louis Railway Company or the Western & Atlantic Railroad Company. All of said bills of lading recited in the usual form the receipt of the cotton from the shippers, and provided that said cotton was to be transported to Norfolk, Va., and delivered to 'order notify Hamilton, Gibson & Leake, via Bell Street Compress, Atlanta, Georgia.' (See original bills of lading.) All of the cotton covered by said bills of lading was brought to Atlanta by the Nashville, Chattanooga & St. Louis Railway or the Western & Atlantic Railroad, either as the initial carrier or as the intermediate carrier, and all the cars containing said cotton were delivered by the Western & Atlantic Railroad, at Atlanta, to the Southern Railway Company. (See receipts by the Southern Railway Company to the Western & Atlantic Railroad Company.) All of the cars containing said cotton were by the Southern Railway Company hauled to the Bell Street Compress, and there delivered to said compress. Contemporaneously with the delivery of said cotton to the said compress, the Western & Atlantic Railroad Company delivered manifests of freight waybills to said Bell Street Compress; said manifests being substantial copies of the waybills, which were in turn substantial copies of the bills of lading. In each of said manifests directed and delivered to said Bell Street Compress, the cotton was described, its destination, Norfolk, Va., was given, and the consignee, 'order notify Hamilton, Gibson & Leake,' was also set out. (See manifests of freight waybills in evidence.) The cars containing said cotton, when delivered to the Bell Street Compress, were by the agents of said compress opened, and the cotton therein delivered at the compress to Hamilton, Gibson & Leake by the agents of the compress. (See papers in evidence, headed "Atlanta Compress," etc., and evidence of J. D. Turner, J. H. Shadded.) Said cotton was shipped via the Bell Street Compress for the purpose of being compressed and substituted in order to facilitate transportation. After being so compressed, it was by the agents of the compress delivered by loading sheets to Hamilton, Gibson & Leake, and again shipped, but to where it does not clearly appear in the evidence; but the fair inference from the evidence is that the destination of said cotton was by Hamilton, Gibson & Leake changed at said Bell Street Compress. The delivery of said cotton to Hamilton, Gibson & Leake by the agents of the compress was without the knowledge of the plaintiff, and without requiring the production of the outstanding bills of lading covering said cotton. (See evidence of J. D. Turner, C. T. Turner, W. W. Turner, C. E. Currier, and M. B. Hamilton.) The Bell Street Compress, at the time said cotton was received by it and compressed and delivered to Hamilton, Gibson & Leake, was owned, controlled, and operated by the Southern Railway Company, not as a separate corporation, but simply as its property, and was operated for the purpose of facilitating its business as a carrier; said railway receiving from said compress the net profits arising from said business. (See interrogatories of Samuel Spencer in evidence, and the evidence of J. D. Turner.) It is admitted that the value of the cotton delivered to Hamilton, Gibson & Leake, as aforesaid, was more than the amount of the debt sued for. The uniform and universal rule and method adopted by carriers in the transferring of freight from one to another was shown to be as follows: The initial carrier executed and delivered to the shipper a bill of lading in the usual form, sometimes, where it was a through shipment, routing the freight the entire way from the initial point to the destination, but in this case not routing the freight, but simply providing that it should be transported to Norfolk, Va., as the destination, and there delivered to 'order notify.' There were three lines of railway from Atlanta to Norfolk, competing for freight, besides the Southern Railway.

When said bills of lading were delivered to the shipper, a waybill was made out, which was a substantial copy of said bills of lading, which waybill was given to the conductor of the train containing the freight for his guidance. When the initial road reached its terminus, said waybill was abstracted at its freight office, and a charge made of said waybill and abstract against the connecting carrier, whereupon said abstract and waybill were sent to the freight officials of the connecting carrier as evidence of the fact that said freight was routed over its line. When the cotton in question reached Atlanta, the initial carrier, to wit, the Western & Atlantic Railroad Company, did not notify the Southern Railway in this accustomed method of the fact that it was a connecting carrier of said cotton, but simply delivered the cars to said Southern Railway, with transfer slips attached to each car, and the Southern Railway tracked said cars to the Bell Street Compress, receiving for such services and trackage from the Western & Atlantic Railroad Company one dollar a car. (See transfer slips and receipts by the Southern Railway Company to the Western & Atlantic Railroad Company for the one dollar per car.)

"It was also shown that it was the usual and necessary custom for the railroads connecting in Atlanta, or delivering freight in Atlanta, which had no track either to the place where the freight was to be delivered or taken from, that the railroad company which did own a track to such place was employed as transfer company to track the freight for the carrier to and from such places, receiving for such service no part of the freight charges, but simply a stipulated sum for such trackage service, paid by the carrier. It was also shown by the defendant that the agents of the compress, by the custom and practice prevailing among the railroads, the patrons of said compress, and the shippers or consignors of the cotton, delivered all cotton going to the compress to shippers or consignors for the purpose of classification, marking, etc., and that the compress received from said shippers or consignors said cotton so classified, and compressed the same, and redelivered it to the consignors or shippers for reshipment, issuing to said consignors or shippers loading sheets, and that the agents of said compress were not expected to require the production of outstanding bills of lading, but delivered said cotton regardless of said outstanding bills of lading. At least, this was the practice of the compress, between it, the railroads, and the consignors of cotton, up to the time of the transaction complained of by the plaintiff: but since the trouble growing out of this transaction this rule has been changed, and now the agents of the compress are required, before delivering the cotton for shipment, to take up outstanding bills of lading. But on this question it is proper to state that the evidence is not uniform; the agent of one of the roads testifying that his road never delivered cotton to the compress on through bills of lading without first requiring the production of the bills of lading, and the agent of another road testifying that he, as agent, required the agents of the compress to take up his outstanding bills of lading before delivering the cotton for reshipment. On this question of handling cotton at the compress in the city of Atlanta, there was further introduced these two rules, adopted by the Southern Railway & Steamship Association, which was composed of the railroads centering in Atlanta:

"'Rule 3. Through shipments of cotton, covered by through bills of lading and waybills, may be stopped in transit for compression, or for compression and substitution, and afterwards reshipped on the basis of a through rate from original point of shipment to final destination, provided the cotton is not held at the compress point for more than 60 days.

"'Rule 4. The destination of such cotton may be changed after reaching the compress point upon surrender of the original bills of lading, and new bills of lading may be issued to correspond to changed destination; the through rate from initial point of shipment to final destination at the time of shipment to be strictly maintained.'

"These are the material facts in the case which are necessary to a proper determination of the questions of law made before me.

## "Conclusions of Law.

"(1) Did the Southern Railway Company receive this cotton as a connecting carrier and thereby become liable as such?" Counsel for plaintiff has cited

numerous authorities on the question of what amounts to delivery. I do not think these decisions are in point, because the fact of delivery is not denied by the Southern Railway Company, but admitted. The character of such delivery and the capacity in which it was received by the defendant are the questions at issue. On this point I hold that the Southern Railway Company, in receiving the cars containing said cotton from the Western & Atlantic Railroad Company, as shown by the receipts in evidence, in the city of Atlanta, in the cars, did not receive it as a connecting carrier, but did receive it solely for the purpose of tracking said cars and delivering the same to the Bell Street Compress, as directed by the transfer slips attached to said cars by the Western & Atlantic Railroad Company. The evidence conclusively shows, in my opinion, these facts: When the cars containing the cotton reached the city of Atlanta, no abstract of the waybill, with the waybill, was sent to the freight department of the Southern Railway Company, nor was any other mode adopted by the Western & Atlantic Railroad Company notifying the Southern Railway Company that it was a connecting carrier, or that through bills of lading were outstanding routing the cotton to Norfolk over its line. The freight agent of the Western & Atlantic Railroad Company, who transferred the cotton, testified that he did not do what was customarily done to indicate the line as a connecting carrier, because it was not intended by his company, the Western & Atlantic Railroad, to indicate that said Southern Railway was the connecting carrier, or to route the cotton over its line from Atlanta; and the agents of all the roads testified that, when it is the intention to name a connecting carrier, this mode of notification of such fact was always adopted. Besides, the Southern Railway Company received said cars without notice of their contents, and was paid by the Western & Atlantic Railroad Company one dollar a car for trackage service, and received no part of the freight charges on the cotton, and such trackage service was always rendered, not only by the custom of the road, but by the necessity of the case, in Atlanta, where the carrier bringing freight into the city had no track at the place of delivery; in this instance, the evidence being that the Southern Railway Company alone had the track at the Bell Street Compress, the place where said cotton was to be delivered for compression and substitution under the bills of lading. I therefore find on this point that the Southern Railway Company is not liable as a connecting carrier, under the bills of lading in this case, in receiving the cars containing the cotton from the Western & Atlantic Railroad Company and tracking the same to the Bell Street Compress, but said service was simply that of a transfer company. Western & A. R. Co. v. Exposition Cotton Mills, 81 Ga. 522, 7 S. E. 916, 2 L. R. A. 102; Savannah, F. & W. Ry. Co. v. Commercial Guano Co., 103 Ga. 590, 30 S. E. 555; Baldwin v. Kansas City, M. & B. R. Co. (Ala.) 20 South. 349.

"(2) Was the transfer of the cotton by the Southern Railway for the Western & Atlantic Railroad Company to the Bell Street Compress such a delivery to the Southern Railway Company as would make it liable as a carrier? The solution of this question is attended with considerable difficulty and depends on the facts in this case. What connection had the Southern Railway Company with the compress, and for what purpose was the cotton stopped at the compress? It is conceded that the compress was not a separate corporation, but was owned and operated by the Southern Railway Company for the purpose of facilitating the transportation of cotton by itself and by other railroads. The business of the compress was incident to the business of transportation. Cotton delivered to it was stopped in transit, not for delivery, but for compression, and while in the compress was awaiting transportation, not delivery, and awaiting transportation under the terms of the bills of lading outstanding. In other words, the business of compressing cotton was carried on by the Southern Railway Company as an incident or accessory to its business of transportation. The agents in charge of the compress were agents of the Southern Railway Company, and appointed by its president, and the net proceeds of said business were paid into the treasury of the railway company. Indeed, it is not claimed that the Southern Railway was authorized by its charter to carry on in any other way than that herein indicated the business of compressing the cotton, and a fair inference is that, if the cotton was therefore delivered to the Bell Street Compress, it was delivered to the Southern

Railway Company for compression and substitution, and also for transporta-
tion; and contemporaneous with the delivery of this cotton to the Bell Street
Compress there was also delivered the manifests from the Western & Atlantic
Railroad Company notifying the agents of the Southern Railway Company in
charge of the compress that the cotton was a through shipment, and was to
be transported to Norfolk, Va., and there delivered as provided by outstanding
bills of lading to 'order notify.' When the Southern Railway at its compress
received this cotton, it received it subject to the information contained in the
manifests, and held it subject to the terms of the manifests; and in my opin-
ion this cotton was practically moving under the bills of lading when stopped
at the compress for the purpose of facilitating its transportation by compres-
sion. In other words, I think the manifests, taken with the other evidence in
the case, distinctly put the Southern Railway Company on notice, not only
that bills of lading were outstanding for the cotton, but that it was regarded
as a carrier for said cotton when ready to continue its route after compression.
Practically, the sending of the manifests by the Western & Atlantic Railroad
to the Southern at its compress was equivalent to sending an abstract of the
waybill and the waybill by the initial carrier, to wit, the Western & Atlantic
Railroad Company, to the Southern Railway Company, when the cotton was
first brought to Atlanta and delivered to it. Only the method adopted of mak-
ing it a connecting carrier was changed, but not substantially changed. I can-
not subscribe to the position of counsel for defendant that its compress busi-
ness, under the facts of this case, was entirely separate and distinct from
its business as a common carrier; but I believe, as above stated, that such
compress business was simply an incident or accessory to facilitate its business
as a carrier, and that therefore, in its business as a compress, it does have
relation to the bills of lading, where it has, as in this case, express notice
in writing that bills of lading are outstanding and unperformed or unaccom-
plished. It takes the cotton with that knowledge, and it takes it subject to
the terms of the bills of lading, and becomes, by implication at least, a party
to the contract of carriage. If I am correct in this position, the delivery of the
cotton at the compress by the agents of the compress, who were also the
agents of the Southern Railway Company, to Hamilton, Gibson & Leake, was
a breach of its duty as a common carrier which would entitle the plaintiff to
recover in this suit for a breach of contract of carriage. Deming v. Storage
Co., 90 Tenn. 306, 17 S. W. 89, 13 L. R. A. 518; North Pennsylvania R. Co. v.
Commercial Nat. Bank, 123 U. S. 728, 735, 8 Sup. Ct. 266, 31 L. Ed. 287;
The Thames, 14 Wall. 98, 20 L. Ed. 804; Furman v. Union Pac. R. Co., 106
N. Y. 579, 13 N. E. 587. Of course, if this conclusion is correct, a custom
or practice prevailing at the compress between the railroad and others could
not affect the rights of the holders of bills of lading, unless such holders had
knowledge of such custom or practice. Western & A. R. Co. v. Ohio Val.
Banking & Trust Co., 107 Ga. 512, 33 S. E. 821; North Pennsylvania R. Co.
v. Commercial Nat. Bank, 123 U. S. 727, 8 Sup. Ct. 266, 31 L. Ed. 287.

"(3) If not liable as a common carrier, is the defendant liable under the
facts of the case as a warehouseman, bailee, or otherwise? The defendant
insists that it is not liable to the plaintiff as a warehouseman, because it had
no contractual relations with the plaintiff as a warehouseman, and that its
duties and liabilities as a warehouseman only result from contract, and not
from any public duty; that as the owner of the compress it had nothing to do
with bills of lading, but its contract relations were only with the railroads,
and limited to its duties of compression. Can this position be successfully
maintained under the facts in this case? I do not think so. On the contrary,
I think that the Southern Railway Company, as owner and operator of the
compress, was clearly made a party to the bills of lading when it received
the manifests of the freight waybills with the cotton, and took possession of
the cotton with the information and notice contained in such manifests. The
question is simply one of diligence. The defendant as a common carrier is
held to a higher degree of diligence than the defendant in its capacity as
operator of the compress. I am not prepared to admit, under the evidence in
this case, that the Southern Railway Company, as owner and operator of the
compress, even if it was not a party to the contract of shipment, did not have
imposed upon it by law some duties and responsibilities relative to the dis-

position of the cotton. It had the cotton in its possession; it received the notice by the manifests that the cotton was to be transported to Norfolk and there delivered to 'order notify'; it was distinctly put on notice that this cotton was not to be delivered to any one except the holders of the bills of lading; and it was particularly put on notice that the cotton should not be delivered to Hamilton, Gibson & Leake. The agents of the Southern Railway, in charge of the compress, testified that they knew the meaning of the words, 'order notify,' contained in the manifests; but the law would charge them with the meaning of those words, anyhow. Yet, with this actual and legal knowledge, the cotton was delivered by the agents of the Southern Railway Company at the compress contrary to the express terms of the manifests and bills of lading, and to the very parties that they were specially ordered not to deliver the cotton to. If these facts do not make a wrongful conversion of property, I am at a loss to know what facts would constitute such conversion. Phenix Ins. Co. v. Clay, 101 Ga. 331, 28 S. E. 853; Western & A. R. Co. v. Ohio Val. Banking & Trust Co., 107 Ga. 512, 33 S. E. 821; North Pennsylvania R. Co. v. Commercial Nat. Bank, 123 U. S. 727, 8 Sup. Ct. 266, 31 L. Ed. 287. Bills of lading are among the most important of commercial securities, and if, under the facts in this case, they are not to be recognized as binding, and the holders of such bills of lading are not protected, then such securities would be practically worthless. Some one had committed a wrong in this case, resulting in great damage to the holders of these bills of lading. Who committed this wrong, and who is responsible under the law for it? Clearly, in this case, Hamilton, Gibson & Leake actually perpetrated the fraud on the holders of the bills of lading; but which one of the railroad companies is responsible, as having suffered the fraud to be committed? It is suggested by the learned counsel for the defendant that the Western & Atlantic Railroad Company was at fault in not taking up its bills of lading before it delivered the cotton to the compress. I do not think this position tenable. The bills of lading had not been accomplished, and the Western & Atlantic Railroad Company might have had some difficulty in finding them or taking them up, and therefore it substituted its manifests of the freight waybills, and when it had delivered the cotton to the Southern Railway at the compress, and had notified it of the contents of the bills of lading by its manifests, it could have had no other connection or control over the cotton, and was relieved of any further liability in connection therewith. See Savannah, F. & W. Ry. Co. v. Collins, 77 Ga. 376, 3 S. E. 416; Fitzsimmons v. Southern Exp. Co., 40 Ga. 330; Ela v. American Merchants' Union Exp. Co., 29 Wis. 611; Civ. Code Ga. § 2298. And see specially on this point the opinion of the court in the case of North Pennsylvania R. Co. v. Commercial Nat. Bank, 123 U. S., on page 735, 8 Sup. Ct. 270, 31 L. Ed. 290. But, even if the defendant corporation was innocent in this case, it would, nevertheless, in my opinion, be liable to the plaintiff under the facts by reason of the familiar principle of law that, where one of two innocent parties must suffer for the fraud of another, the loss should fall upon him who enables such third person to commit the fraud. But the defendant insists that it is not liable to the plaintiff, as a warehouseman or otherwise, in this suit, as it is an action ex contractu, and not ex delicto.

"Is the declaration in this case one of assumpsit on the contract, or is it one on the case for the wrongful conversion of the cotton? According to Hutchison on Carriers, the declarations in the two kinds of actions are so nearly alike as to perplex the astutest judges to find out to which class the declaration belongs; the distinction in the two forms being confessedly nice and difficult to draw. In Georgia, where all formal distinctions between actions have been abolished by statute, and where the plaintiff is simply required to set forth by petition and in paragraphs his cause of action, I do not think the distinction is of practical importance. I am, however, inclined to think the declaration in this case can be treated either as one in assumpsit for breach of the contract or an action on the case for breach of the duty; but I think it was the intention of the pleader to bring an action for the breach of the duty,—for the wrongful conversion of the cotton by the defendant,— and that the contract as set out is the inducement or consideration from which the duty results, the breach or neglect of which duty was the wrongful

delivery of the cotton, and the damage resulting from such breach being the gravamen of the action. Hutch. Carr. 744, 749; Long v. Rogers, 17 Ala. 540; Railroad Co. v. Fulgham, 91 Ala. 556, 8 South. 803; Railway Co. v. Paul (Ark.) 40 S. W. 705, 37 L. R. A. 504, 62 Am. St. Rep. 154. I do not think that, even in this view of the case, any custom prevailing at the compress, between it and the railroads and others, could affect the rights of the owners of this cotton, unless such owners had knowledge of such custom. Indeed, I think that rule No. 4, as cited by the defendant, was violated by it when this cotton was delivered to Hamilton, Gibson & Leake, because it is a fair inference from all the facts that the destination of this cotton was changed after reaching the compress, and without the surrender of the original bills of lading, which, under this rule, could not have been done. I therefore conclude that, under the facts and the law of this case, the defendant is liable to the plaintiff, whether this action is regarded as one of assumpsit for breach of contract or an action on the case for breach of duty imposed by contract or by law. The defendant was the custodian of the cotton, either as a carrier or as the owner and operator of the compress, and in either capacity the duty and obligation which the law imposed upon it in connection with the cotton was violated in the wrongful delivery of the cotton to Hamilton, Gibson & Leake. I therefore find that the plaintiff is entitled to recover of the defendant in this case a judgment for the sum of $12,952.37, and interest on said sum from the 1st day of April, 1898, until paid, at the rate of 8 per cent. per annum; this being the amount due on the note, and it being agreed that the value of cotton involved is in excess of this amount."

To the foregoing report, when the same was filed in this court, there were numerous exceptions; but the questions raised by these exceptions are such that they can be disposed of without special reference to each of them. After argument on the exceptions decision was reserved, and on December 7, 1900, the court submitted to counsel for the respective parties the following:

"I have reached a conclusion in the above-stated case that the defendant company is not liable to the plaintiff, so far as the transfer of this property from the Western & Atlantic Railroad depot to the compress is concerned. The auditor so found. I have reached the further conclusion that there is no liability on the part of the defendant company to the plaintiff, either as a connecting or a common carrier. Any duty the defendant owed the plaintiff as to the transfer of this cotton was discharged. As an outgoing carrier it assumed no duty, the evidence all showing that the cotton could have been routed out by any road entering Atlanta. I differ with the auditor on this point. The only question remaining in the case is whether or not the defendant company is liable to the plaintiff as a warehouseman, because of its ownership of the compress. As incidental to this question, and perhaps as entering into and a part of it, may be considered the relation which a compress company bears to the matter of transportation and carriage of cotton generally, and how far this relationship, in the matter of carriage and transportation, affected its duty to the plaintiff. Second. If there be such liability on the part of the defendant to the plaintiff as a warehouseman, can there be a recovery under the declaration in this case? As the oral argument of the case was in connection with questions which I am clear are not involved, I should like to hear counsel briefly, some time next week, on the two questions named; that is, first as to the right of recovery against the defendant as a warehouseman, and, second, can it be had under the pleadings in the case?"

Reargument was subsequently had, as suggested to counsel, and the case again taken under advisement by the court. The question remaining, therefore, is whether this defendant is liable to the plaintiff as the owner of the compress, and considered apart from and without reference to its duties as a common carrier. As stated, the relation of the compress company to the matter of transportation and

storage of cotton generally may be considered in connection with this question.

I do not attach special importance to the fact that this compress is owned by a railway company. The Southern Railway Company having discharged the duty which it undertook for the Western & Atlantic Railroad Company to deliver the cotton at the compress, and having assumed no obligation whatever to take it therefrom, the case stands to my mind as if the compress had been owned by a corporation not connected in any way with the transportation, or by private individuals. Necessarily, however, its relation to the transportation of cotton as a compress company must be considered. The compression of cotton is now regarded as necessary to its transportation by a railroad. Cotton en route from interior points to the coast, it appears, always stops somewhere to be compressed. The importance of this matter of compression en route is shown by the rule adopted by the Southern Railway & Steamship Association, which the auditor has copied in his report. The business, therefore, of compressing cotton is a very important part of its transportation. This cotton went into the hands of the managers of the compress; the manifests accompanying it showing the contents of the bills of lading. These bills of lading showed that this cotton was shipped to "order notify." The manifests put the compress company on express notice that the cotton did not belong to Hamilton, Gibson & Leake. They expressly notified the persons in charge of the compress that the bills of lading had been transferred by Hamilton, Gibson & Leake to others, who had become by such transfer the real owners of the cotton. While a bill of lading is not a negotiable instrument, it is generally held now to be a symbol, and its transfer and possession carries with it ownership. The supreme court of Georgia, in the case of Western & A. R. Co. v. Ohio Val. Banking & Trust Co., 107 Ga. 500, 33 S. E. 821 (quoting from page 516, 107 Ga., and page 823, 33 S. E.), in laying down the rule on this subject, and quoting from a decision of the supreme court of the United States, states the same as follows:

"The case of North Pennsylvania R. Co. v. Commercial Nat. Bank, 123 U. S. 727, 8 Sup. Ct. 266, 31 L. Ed. 287, was an action by the assignee of certain freight receipts for cattle shipped, to recover damages of the carrier for a misdelivery. The only defense was that the cattle had been delivered to the party whom the carrier had been instructed to notify of their arrival, although such party presented no bill of lading or freight receipt. It was further claimed that such delivery was according to the custom and course of business of the parties; but, it not appearing that this custom was known to the holder of the receipts or bill of lading, it was held that the delivery set up was not a defense. 'A delivery by the carrier upon the production of an unindorsed bill of lading will not be excused merely upon proof of a custom to deliver without an indorsement, unless it can be clearly shown that the party thereby damaged was aware of the custom and acted with knowledge of it.' 5 Am. & Eng. Enc. Law (2d Ed.) 209, and cases cited in note 3. It seems that the principle laid down by these authorities, to the effect that the rights of one who is a bona fide holder of a bill of lading and without notice will not be affected by a delivery of the goods to the person to be notified of their arrival, without the production of the bill of lading, and in pursuance of an agreement between such person and the consignor or of a custom existing among the parties, sustains the position that the rights of the plaintiff in this case, as against the defendant, were not affected by the arrangement or custom, unknown to the plaintiff, that the Atlanta Grocery Company, without the produc-

tion of the bills of lading, should have the right to change the destination of the goods. One of the common uses of bills of lading is to enable sellers of goods to obtain advances upon their shipments by drawing on the purchasers for the price of the goods, attaching the bill of lading to the draft, and having the draft discounted by some bank, which holds the bill of lading and relies upon its terms as security for the payment of the draft. The carrier must have knowledge that the bill of lading may be so used, and thus get into the hands of a bona fide holder, and is bound to see that the goods are not delivered until the draft is paid and the bill of lading produced. To permit the rights of a bank, in good faith and without notice discounting a draft with a bill of lading attached, and relying on the terms of the bill of lading as security, to be affected by an existing arrangement or custom among the consignor, the purchaser, or person to be notified of the arrival, and the carrier, that goods should be delivered to the purchaser or person to be notified, or that he should have the right to change their destination, without payment of the draft and production of the bill of lading, would be a gross fraud upon the bank, and manifestly result in preventing shippers getting advances on goods sold, by drawing for the purchase price, attaching draft to bill of lading, and having same discounted."

In the case of Lowe v. Railroad Co., 101 Ga. 320, 28 S. E. 867, this is said:

"The fact that Hudgins was the party to be notified of the consignment, and whose name appeared upon the bill of lading in this connection, does not alter the rule. The very presence of the words, 'Notify Hudgins, Atlanta, Ga.,' in the bill of lading, shows that Hudgins was not intended as the consignee. If he had been, then such words were wholly unnecessary, as it is the duty of the carrier to notify the consignee of the arrival of the goods without being requested or instructed to do so. Hutch. Carr. (2d Ed.) § 131b, and cases cited."

In the case of North Pennsylvania R. Co. v. Commercial Nat. Bank, cited in Western & A. R. Co. v. Ohio Val. Banking & Trust Co., supra, this question is considered, and the duty of a railroad company to exercise care in the delivery of goods which are consigned to "order notify" fully discussed, and a delivery made regardless of such directions was held to create liability, even in the case of live stock, where prompt delivery is so necessary.

Such being the duty and responsibility of carriers in reference to bills of lading on which the entry "order notify" is made, the question next presented is, how far this compress company was charged with a similar duty and a similar liability for a conversion or wrongful delivery in violation of this duty. The auditor says as to this:

"I am not prepared to admit, under the evidence in this case, that the Southern Railway Company, as owner and operator of the compress, even if it was not a party to the contract of shipment, did not have imposed upon it by law some duties and responsibilities relative to the disposition of the cotton. It had the cotton in its possession; it received the notice by the manifests that the cotton was to be transported to Norfolk and there delivered to 'order notify'; it was distinctly put on notice that this cotton was not to be delivered to any one except the holders of the bills of lading; and it was particularly put on notice that the cotton should not be delivered to Hamilton, Gibson & Leake. The agents of the Southern Railway, in charge of the compress, testified that they knew the meaning of the words, 'order notify,' contained in the manifests; but the law would charge them with the meaning of those words, anyhow. Yet, with this actual and legal knowledge, the cotton was delivered by the agents of the Southern Railway Company at the compress, contrary to the express terms of the manifests and bills of lading, and to the very parties that they were specially ordered not to deliver the cotton to."

The question of duty as to the delivery of this cotton cannot be considered without a recognition of the fact that the cotton went into the hands of the compress people accompanied by the manifests, with the entry of "order notify" thereon, the import of which entry the persons in charge of the compress testified, according to the auditor's report, that they fully understood. The question thus presented has been one of difficulty to me, and I have given it very earnest consideration. I have reached a conclusion in the matter, although not free from doubt as to its correctness. This conclusion is not reached, however, because of the fact that the compress is owned by the railway company; for, as I have stated, I do not regard this as entering into the matter, or as affecting the question in any way whatever; but I do regard the fact that stoppage for compression is a link in transportation. The bills of lading in evidence show that the cotton in question was sent care of Bell Street Compress, Atlanta, Ga. The Bell Street Compress is made, by the bills of lading, the waybills, and these manifests, a part of the route over which this cotton was to be transported. The managers of the compress accepted the cotton, accompanied by these manifests, which expressly placed the cotton in their care, and with the statement thereon that it was to be delivered to "order notify," which, as has been indicated, was a direct notice that the consignees, Hamilton, Gibson & Leake, were not the proper parties to whom the cotton should be delivered in the absence of the bills of lading. The compress company made of itself, by the character of its business and by the manner in which this cotton was received, so much a part of the system transporting the cotton that it is impossible to escape the conclusion that there was a duty on its part to protect the holders of the bills of lading, who were the real owners of the cotton.

The case is entirely without precedents. At least, I have not been shown, and have been unable to find, any case making the precise question. But it seems to me clear that there was a duty on the part of the compress to see that this cotton was properly delivered. When the compress people accepted the cotton, accompanied by the manifests, which indicated a particular duty by all who handled the cotton with reference to the same, they must have undertaken to discharge such duty. Even conceding that, as a compress, there was no common-law duty with reference to the cotton on the part of the compress company, still, when it made itself, by the character of its business and by the acceptance of the cotton routed through it, by the terms of the bills of lading, a link in the route over which the cotton must pass, it must, it seems to me, have assumed such duty as the law imposed upon all connected with its carriage from the orignal point of shipment to its destination. The reading of this record, showing the relation of compress companies to the matter of carriage of cotton by railroads, leads to the inevitable conclusion that there is such a close relation and connection between compression and carriage as puts an imperative duty on compress companies to see that cotton is not diverted from the direction given it in the bills of lading.

Assuming that there was a duty on the managers of the compress to see that the cotton was not delivered to others than the true own-

ers, as such true owners were indicated by the bills of lading, or, rather, by the manifests which they had, the next question is, can there be a recovery against the defendant on the declaration in this case? It is contended that the declaration sounds in contract, and that there can be no recovery on a contract between the plaintiff and the defendant, because there never were any contractual relations between the parties. The argument is that the delivery for compression was made to the compress company by the Western & Atlantic Railroad Company, and that the contract, if any was made, was with the latter company, and the right to enforce the same, if any exists, is in that company. It is urged that this cannot be treated as an action ex delicto for the wrongful delivery or conversion of the cotton, and that even under the liberal system of pleading in Georgia it is an action ex contractu. Counsel for defendant cite and rely very much in argument on the case of Atlantic & P. R. Co. v. Laird, 164 U. S. 393, 17 Sup. Ct. 120, 41 L. Ed. 485. Assuming that there was a duty on the part of the managers of the compress to see that this cotton was properly delivered, I agree with the auditor in his conclusion that the character of the pleadings is not very material. Believing that the relation of the compress company with the transportation of this cotton placed on it a duty of the same character as the law would impose on a connecting carrier, it would be immaterial, even under the view of the learned counsel for the defendant, whether the rights of the bank were treated as rights existing ex contractu or ex delicto. The argument on this subject is based on the assumption that the compress company owed no duty in the premises. As in my opinion it owed such duty as has been indicated, the argument falls. The system of pleading in Georgia now is very liberal, and, this being an action at law, that liberality will be fully recognized in this court. I think that, taking this declaration altogether, the plaintiff has plainly and distinctly set forth its cause of action; sufficiently so, at least, at the present stage of the case, and after a finding thereon by the auditor. It may be that the pleader had more particularly in mind the liability of the defendant as a carrier, and less as a warehouseman; but the whole case was investigated before the auditor, and a finding had and report made, which, after stating the facts, correctly applies the law as to the liability of the defendant in the respect now under consideration and reaches a correct conclusion. While, as has been stated, I differ with the auditor in his finding that the defendant is liable as a carrier, he was, I think, correct in finding it liable simply as a compress company.

The conclusions are: (1) That the manifests, which were, as the auditor states, substantial copies of the bills of lading, put the compress on notice that Hamilton, Gibson & Leake were not the real owners of the cotton, but that some one else was, who would be the holder of the bills of lading. (2) In view of the relation of the compress company to the transportation of cotton (it being, as has been expressed, a link in the route over which the cotton was sent), it owed a duty to the real owners of the cotton, and it should not have delivered the same without the presentation of the bills of lading. (3) That the pleadings in the case are sufficient to justify a recovery

against the defendant for a failure to discharge its duty in the respect indicated and for the wrongful delivery or conversion of the cotton.

The exceptions to the report of the auditor will be overruled, and the report confirmed.