PERKETT v. MANISTEE & NORTHEASTERN RAILROAD CO.

1. CARRIERS—INTERSTATE COMMERCE ACT—FEDERAL REGULATION—
FREIGHT—LIABILITY OF INITIAL CARRIER—CONSTITUTIONAL LAW.
    By Act of Congress June 29, 1906, chap. 3591, § 7, 34 U. S.
    Stat. 593, initial carriers of freight were made responsible
    for the acts and negligence of a connecting carrier, as
    agent, and the law being of general operation throughout
    the United States, and constitutional, is binding on the
    State courts in actions involving less than the amount
    required to confer upon the Federal court jurisdiction.[1]

2. EVIDENCE—WAIVER — CORRESPONDENCE—SELF-SERVING DECLARA-
TIONS.
    Where plaintiff wrote a letter to a connecting carrier
    over whose line a consignment of apples was sent that
    was diverted to a point different from the one named in
    the bill of lading, objections or protests made in the letter
    were properly received in evidence to rebut defendant's
    claim that plaintiff consented to or acquiesced in the
    stoppage; but other statements of fact in plaintiff's favor
    were rightly excluded as incompetent.

3. SAME—BILL OF LADING—PLEADING—VARIANCE.
    Defendant, the initial carrier, being liable for acts of
    connecting carriers whether it owned a railroad system
    to the place of delivery or not, the bill of lading which
    by its terms showed that a connecting carrier was to de-
    liver the consignment at the destination, was admissible
    in evidence notwithstanding that the declaration incor-
    rectly averred that defendant was a common carrier be-
    tween the two points.

4. SAME—DECLARATION.
    Nor was it a fatal variance to aver under the Federal
    statute that defendant was liable for the acts of connect-
    ing carriers as its agent, though the bill of lading in terms
    provided that defendant received the goods for transpor-
    tation over its own line, and as to the remainder of the

---

[1]On the question of State statutes regulating the liability of
carriers as to shipments over connecting lines as interference
with interstate commerce, see note in 7 L. R. A. (N. S.) 388.

route acted only as agent: the bill of lading was admissible under the pleading.

5. CARRIERS—BILL OF LADING—ASSIGNMENT—ACTIONS—PARTIES.

The shipper of freight did not lose his right to recover for injury to the shipment because he indorsed the bill of lading to a bank to collect a draft attached thereto; when it appeared that the bank recognized its position as his agent, and after failing to make collection returned the draft and shipping receipt to plaintiff charging back to him the amount with which his account had been credited.

6. SAME—CONVERSION—SALES.

Conceding that at the time of the wrongful diversion of the car of apples, plaintiff had parted with his title, he afterwards re-acquired it and therewith the right to bring the action; such right of action for conversion being assignable in Michigan.

7. SAME—PRINCIPAL AND AGENT—SALES.

Evidence that plaintiff obtained from the consignee directions for shipment of goods sold, that he caused a bill of lading to be issued to the destination given, and sent it with draft attached to a bank at that point which was unable to collect and wrote plaintiff for permission to send the papers for collection to another place where the shipment had been stopped and where the consignee was, that plaintiff gave no directions or consent to the diversion of the freight, which was attached and sold by the consignee, furnished no justification for the conversion and had no tendency to prove the consent of plaintiff, under a bill of lading containing a stipulation that inspection should not be permitted without the written consent of the consignor or unless provided by law.

8. SAME—EVIDENCE—BILL OF LADING.

Prior or contemporaneous oral negotiations are merged in the written bill of lading which cannot be varied or contradicted by parol evidence.

9. SAME—TROVER—DEFENSES.

Seizure of a consignment of freight by the purchaser under a writ of attachment is a defense to an action by the consignor only when there was no laches or connivance on the part of the carrier; and where the railroad company diverted the consignment to a point 60 miles from its destination, and left it standing on the

tracks, permitting the consignee to open, handle and deal with the property as he saw fit in violation of the contract of carriage, its wrongful stoppage of the car amounted to collusion as a matter of law and the trial court correctly directed a verdict for plaintiff.

Error to Grand Traverse; Mayne, J.   Submitted January 13, 1913.   (Docket No. 69.)   Decided May 28, 1913.

Case by Louis F. Perkett against the Manistee & Northeastern Railroad Company for the loss of a car load of apples.   Judgment for plaintiff on a directed verdict.   Defendant brings error.   Affirmed.

*Wilson & Wilson (Parm C. Gilbert,* of counsel), for appellant.

*H. C. Davis (Reuben Hatch,* of counsel), for appellee.

STEERE, C. J.   This action was brought to recover damages from defendant for failure to deliver at its destination a car load of apples shipped by plaintiff, on December 3, 1909, from Traverse City, Mich., consigned to himself at Chamberlain, S. D., with instructions to notify W. W. Davis at Chamberlain.   The case was tried in the circuit court of Grand Traverse county before a jury, and judgment entered on a directed verdict in favor of plaintiff for the value of the consignment.

The facts are practically undisputed.   In the latter part of October, 1909, W. W. Davis, who resided at Mt. Vernon, S. D., visited Traverse City and purchased from the plaintiff six car loads of apples at $3 per barrel, free on board at Traverse City.   Davis at that time gave plaintiff instructions as to billing the cars.   All were sent to points in South Dakota according to such instructions; the first to Mt. Vernon, the second to Puckwana, the third to Mt. Vernon, the

fourth to Chamberlain, the fifth to Puckwana, and the sixth to Chamberlain. Three of the first five were diverted by Davis, from the place to which they were billed, to other towns in the vicinity. The first five car loads shipped were all received by Davis at their destination, or at the place to which they were diverted by him, and paid for according to agreement. On December 3, 1909, the sixth car, which is the subject of this litigation, was shipped, in accordance with instructions from Davis, to Chamberlain, S. D. Defendant promptly sent the car forward to its destination, according to a proper routing, which took it, after leaving defendant's line, over the Chicago, Milwaukee & St. Paul Railroad, on which line Chamberlain is located. The shipment contained 194 barrels of apples. Plaintiff delivered the apples free on board the car at Traverse City, and received from defendant a regular bill of lading, in form required by law and as authorized by the State railroad commission. On the same date, after so delivering the apples to defendant, plaintiff drew a sight draft on Davis for $470.40, which was the balance of the purchase price, a previous payment having been made, and deposited the draft, with the bill of lading and invoice attached, in the First National Bank of Traverse City, for collection. The Traverse City Bank, on the same day, credited the amount of the draft to plaintiff's account and sent the same forward, with the invoice and bill of lading, for collection to the Whitbeck National Bank of Chamberlain, S. D.

The car load of apples in question never reached Chamberlain, but was stopped at Mt. Vernon, Davis' residence, 60 miles short of its destination, on December 15 or 16, 1909, where it remained in the yards of the company until January 3, 1910. Owing to the stoppage of the car at Mt. Vernon and the fact that Davis resided there, the Whitbeck National Bank of Chamberlain was unable to collect the check or present

it to Davis for payment, and so advised the Traverse City Bank, which thereupon authorized the Whitbeck Bank to send the same to the First National Bank of Mt. Vernon for collection.  This was done, and Davis, on presentation of the draft and bill of lading to him, dishonored the same, refusing payment.  The draft and papers attached were then returned uncollected to the First National Bank of Traverse City, on January 6, 1910, and by it charged back to plaintiff's account.  No diversion of the car from Chamberlain after it was billed is shown to have been consented to by plaintiff, and he had no knowledge of the fact until December 21, 1909, when, on returning to his office in Traverse City from a temporary absence on business, he found a letter from Davis, received at the office two days before, informing him that the car was at Mt. Vernon, and making complaint as to the quality of this shipment, and previous shipments which he had already accepted and paid for, demanding a reduction in the price previously agreed upon.  Plaintiff protested by mail, both to Davis and to the terminal carrier, but to avoid further trouble offered to make a deduction of $100 on the price, to which Davis replied:

"Think I am entitled to $500 damage but to settle will take $150."

In the meantime the car stood on a siding at Mt. Vernon, and Davis was permitted by the railroad company to have quasi possession of it to look after the apples.  He states that he put in an oil stove to keep them from freezing.  On January 3, 1910, Davis caused the entire shipment to be seized by the sheriff under a writ of attachment issued out of the district court of Davidson county, S. D., on a suit commenced by himself.  On January 8, 1910, the sheriff of said county mailed a notice of said attachment to plaintiff

herein. Subsequently Davis obtained a judgment, and the property was sold under such attachment proceedings, the date of sale not being shown in this record. As a result, the consignment was a total loss to the shipper except the $100 paid before shipment. Plaintiff thereafter, and within the requisite time, demanded payment for his loss from defendant, the initial carrier, and duly presented his claim in writing. The same was considered by the proper officials of defendant, and payment refused.

This action was then brought, relying and declaring, amongst other things, upon the Federal interstate commerce act of June 29, 1906, chap. 3591, § 7, 34 U. S. Stat. 593 (U. S. Comp. Stat. Supp. 1911, p. 1307), which provides, in part:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.

"That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

At the conclusion of the testimony it was agreed, by counsel for the respective parties, that there were

no questions of fact in the case for the jury to pass upon, and each side requested the court to direct a verdict in its favor. As to the measure of damages, counsel for defendant contended that, if the court should direct a verdict in favor of plaintiff, it could be only for the amount of his draft. This was conceded by counsel for plaintiff, interest being added from January 4, 1910, and the amount computed without objection was determined to be $522.83. The court thereupon, after argument of counsel on the legal questions involved, directed a verdict and entered a judgment for the amount stated.

The validity and purpose of that portion of the interstate commerce law relied upon by plaintiff is no longer open to question. In *Atlantic Coast Line R. Co.* v. *Riverside Mills,* 219 U. S. 186 (31 Sup. Ct. 164, 31 L. R. A. [N. S.] 7), Justice Lurton, in delivering an opinion of the Supreme Court sustaining the constitutionality of the act, said:

"The requirement that carriers who undertook to engage in interstate transportation, and as a part of that business held themselves out as receiving packages destined to places beyond their own terminal, should be required as a condition of continuing in that traffic to obligate themselves to carry to the point of destination, using the lines of connecting carriers as their own agencies, was not beyond the scope of the power of regulation. The rule is adapted to secure the rights of the shipper by securing unity of transportation with unity of responsibility. The regulation is one which also facilitates the remedy of one who sustains a loss, by localizing the responsible carrier. Neither does the regulation impose an unreasonable burden upon the receiving carrier. The methods in vogue, as the court may judicially know, embrace not only the voluntary arrangement of through routes and rates, but the collection of the single charge made by the carrier at one or the other end of the route. This involves frequent and prompt settlement of traffic balances. The routing in a measure depends upon the certainty and promptness of such traffic

balance settlements, and such balances have been regarded as debts of a preferred character when there is a receivership.  Again, the business association of such carriers affords to each facilities for locating primary responsibility as between themselves which the shipper cannot have.  These well-known conditions afford a reasonable security to the receiving carrier for a reimbursement of a carrier liability which should fall upon one of the connecting carriers as between themselves."

The statute of June, 1906, is a law of general operation throughout the United States, and as such is to be given effect in the State courts, their jurisdiction being concurrent with the Federal courts where the amount in controversy is sufficient for Federal court jurisdiction, and where the sum involved is not large enough the State courts only have jurisdiction. *Smeltzer* v. *Railroad Co.* (C. C.), 168 Fed. 420.

Based on its assignments of error, it is urged and argued in behalf of defendant that a verdict should have been directed in its favor, for the reason that the First National Bank of Traverse City, and not plaintiff, owned the car load of apples at the time it was stopped at Mt. Vernon and seized by the sheriff of that county; that both the bank and plaintiff are shown to have acquiesced in the change of destination; that plaintiff's bill of lading was not admissible under his declaration; and that the case in any event should be reversed because the court erroneously admitted in evidence a certain letter sent by plaintiff on December 22, 1909, to the general freight agent of the Chicago, Milwaukee & St. Paul Railroad, protesting against the stoppage of the car short of its destination, giving his reasons and stating his claim in relation to the matter.  Though the court thought this letter admissible in part for certain purposes, yet in disposing of the case by a directed verdict it was not considered by the court, according to the record.  The learned circuit judge then said, amongst other things:

"In my opinion the bill of lading constituted a contract for a continuous trip; that this car of fruit should have made one continuous trip from Traverse City to Chamberlain, except as it might be subject to necessary stops in the course of business, and the stop at Mt. Vernon would not come under this head. They had no right, in my opinion, under this contract, to stop the car by order of W. W. Davis. The facts would not warrant any holding that there was a waiver of the right to the performance of the contract by Mr. Perkett or by the bank; and for this reason, as the letter from Mr. Perkett that was offered in evidence, and to which objection was made, contains considerable matter that was in my opinion not admissible and might have been prejudicial, I include it at the present time, the jury being excused and the matter being before the court. I think the plaintiff is entitled to the benefit of the letter, as far as it shows that there was no actual waiver on his part, and I admit it in evidence, and the defendant may have the benefit of an objection or exception so that they may make use of it. I will say that independent of this letter, I find for the plaintiff. If this letter had not been in evidence, or had not been written, my opinion is that the plaintiff would be entitled to recover. I make this decision without considering the letter."

We think it clear, as the court stated, that much of the letter was inadmissible, being devoted to statements of fact in plaintiff's favor, and reasons why he protested against the car not being sent to Chamberlain according to its billing. It is true the letter was not directed to defendant or one of its officials, but it was sent to the connecting terminal carrier, then having custody and direct control over the car, and then, as applied to that shipment, the agent of defendant. The letter was written as soon as plaintiff learned the car was stopped at Mt. Vernon, and before its contents were seized by attachment. It was defendant's claim that plaintiff had acquiesced in the car being stopped there. We think it was competent in that connection to show that he promptly wrote the

connecting carrier, who was defendant's agent then in control of the property, with power to forward it to its destination, protesting and objecting to a violation of the contract of shipment.

It is contended that the bill of lading was not admissible in evidence because "it shows on its face that defendant was not to deliver the apples at Chamberlain, but that this was to be done by the St. Paul road," while the declaration was drawn on the theory that the defendant operated a railroad from Traverse City to Chamberlain, alleged defendant was a common carrier between those two points, and agreed to carry the apples and deliver them to plaintiff at Chamberlain.

The declaration recites in apt language the cause of action, and the Federal statute under which it is planted. Under that statute defendant's liability would be the same whether it owned a line clear to Chamberlain or not. The declaration is not misleading. It alleges the delivery to defendant of 194 barrels of apples, for shipping from Traverse City on a certain date, the receipt of a bill of lading by plaintiff from defendant, describing the property in apparent good order—

"Consigned to the order of L. F. Perkett, destination Chamberlain, State of South Dakota, notify W. W. Davis at Chamberlain, State of South Dakota, route, Chicago, Milwaukee & St. Paul Railway, car initial, A. R. L., car number 6423, which said defendant, in and by said receipt or bill of lading, agreed to carry to its usual place of delivery at said destination, if on its road, otherwise to deliver to another carrier on the route to said destination, and said defendant further agreed, in and by said receipt or bill of lading, that the surrender of said receipt or bill of lading, properly indorsed, should be required before the delivery of the property, and that inspection of the property covered by the said receipt or bill of lading should not be permitted unless provided by law,

or unless permission was indorsed on the original bill of lading, or given in writing by the shipper."

It is also urged as a fatal variance between the declaration and the bill of lading that the latter provides:

"In issuing this bill of lading this company agrees to transport over its own line, and except as otherwise provided by law, acts only as agent with respect to the portion of the route beyond its own line."

The law apparently otherwise provides, treating the connecting carriers as agents of the receiving carrier, and holding the latter liable as principal for the acts of its agents. *Atlantic Coast Line R. Co.* v. *Riverside Mills, supra.* We think the shipping bill was sufficiently described in the declaration to entitle it to be received in evidence.

The contention that plaintiff cannot recover because he did not own the apples when stopped at Mt. Vernon and when attached is not tenable. It is true that he had indorsed the bill of lading and delivered it to the bank for collection, and in the meantime had been credited with the amount it was expected would be collected, thus technically, for the time being, vesting the bank with title to the apples; but the bank, when endeavoring to make the collection, recognized that it was acting for him and under his direction, and obtained his consent before sending the draft to Mt. Vernon for presentation to Davis. On return of the uncollected draft and attached papers, from the Mt. Vernon bank to the Traverse City bank, the draft was promptly charged back to plaintiff, and the papers returned to him. The bank, having failed in making collection, had no further interest in the matter. Plaintiff's legal title to the property and relations with the defendant carrier then stood as they did when the bill of lading was issued. But, conceding that plaintiff at the time of the alleged wrongful diversion and conversion had entirely parted with the title and

then had no interest in the property, a condition fatal in some jurisdictions to his subsequently bringing an action in trover (which is the principle here contended for by defendant) it is, in any event, clear that he had reacquired ownership of the property, with legal title, at the time this suit was brought. This action involves a right of property, incident to which is a wrongful withholding or conversion of the property, and a right of action for conversion is assignable in this State. *Final* v. *Backus,* 18 Mich. 218; *Brady* v. *Whitney,* 24 Mich. 154; *Grant* v. *Smith,* 26 Mich. 201; *Upham* v. *Dickinson,* 38 Mich. 338; *Dayton* v. *Fargo,* 45 Mich. 153 (7 N. W. 758) ; *Felt* v. *Evaporating Co.,* 52 Mich. 602 (18 N. W. 378) ; *Crippen* v. *Fletcher,* 56 Mich. 386 (23 N. W. 56) ; *Smith* v. *Thompson,* 94 Mich. 381 (54 N. W. 168).

We do not find that there is legal evidence that plaintiff and the bank consented to the car being stopped at Mt. Vernon. It is contended that Davis, under his contract with plaintiff, had the right to do so, and that the bank, with plaintiff's approval, on being advised that the car had been stopped short of its destination, acquiesced in that diversion by sending the shipping bill and draft there for collection. We find no testimony in the record tending to show any agreement between Davis and plaintiff that Davis could, at his option, divert any of the cars from the points to which they were billed. Davis furnished to plaintiff, at the time the apples were purchased, the points to which they should be shipped. He testifies:

"I told him that I would give him the billing of the cars as soon as I could, but probably would want to change the order or billing on part of them; he said to let him know as soon as I found out just where I wanted them."

They were all billed according to Davis' directions, and there is nothing in his testimony, or any other that we have discovered, tending to show any authority

for Davis to change the destination after the car was once billed and started on its way; neither does the fact that, when the draft upon Davis could not be presented at Chamberlain, it was sent to where he resided for presentation furnish any evidence of consent to the car being stopped there. Plaintiff testifies most positively that he did not consent to any stoppage or diversion of the cars. After he had shipped them, free on board, billed as directed, though entitled to have them carried to their destination according to the contract, it was immaterial to him what Davis and the railroad did with them so long as the drafts sent to the point of delivery were promptly paid. He is shown to have protested against the stoppage of this car as soon as advised of the fact. He had his contract of shipment, and was entitled to rely upon it, and Davis had no right to change the destination without producing the bill of lading. In *Western & Atlantic R. Co.* v. *Trust Co.*, 107 Ga. 512 (33 S. E. 821), involving the wrongful stoppage of certain car loads of corn short of their destination, where they were seized under an attachment, the rule is stated as follows:

"The general rule is that a bill of lading, as a contract expressing the terms and conditions upon which the property is to be transported, is to be regarded as the sole evidence of the final agreement in which are merged all prior and contemporaneous agreements of the parties; and, in the absence of fraud or mistake, its terms or legal effect, when free from ambiguity, cannot be explained, added to, or contradicted by parol."

We conclude there is no competent testimony in this case, written or parol, to contradict or vary the plain terms of the contract of shipment as evidenced by the original bill of lading given plaintiff by defendant at Traverse City.

Under the undisputed facts in this case the seizure of the shipment by legal process at the instance of

Davis cannot prevail as a defense. Such a seizure, to furnish an excuse for failure to comply with the contract of transportation, must have been made without laches, connivance, or collusion on the part of the common carrier. In this case the defendant, without any legal authority from the shipper, at the instance of Davis, stopped this car over 60 miles from its destination, in another county, at Davis' home, and left it standing there for over two weeks upon a side track, during which time it was in the legal custody and control of the terminal carrier, though Davis looked after it and was permitted to open, handle, and examine the packages as he saw fit, in violation of the contract of transportation, which prohibited inspection of the property covered by the bill of lading without written authority from the shipper. The shipper was not consulted at all by the carrier, and the only reason or excuse it had for stopping the car at Mt. Vernon, where Davis could conveniently institute attachment proceedings and seize it in his home county, was that Davis ordered or requested it. While the carrier may have acted in good faith, nevertheless its unauthorized conduct amounted in legal effect to such laches and collusion as preclude interposing as a defense the attending attachment proceedings for which opportunity was afforded by its own misconduct. It is manifest that but for the wrongful stoppage and delay of the car in Mt. Vernon this particular seizure, now urged as a defense, could not have occurred.

The judgment is affirmed.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.