FRENCH v. PERE MARQUETTE RAILWAY CO.

1. CARRIERS—BILL OF LADING—DELIVERY WITHOUT SURRENDER OF BILL—LIABILITY.

Where a bill of lading or a shipping receipt contains a clause providing that a third person shall be notified of the arrival of the goods, or where it contains this clause and an additional clause reciting that the goods are shipped to the consignor's order, the carrier is not authorized to treat the person to be notified as a consignee, and if it delivers the goods to him without production and surrender of the receipt or the bill of lading, it will be liable to the true owner of the goods for any loss resulting from such delivery.

2. SAME—INTERSTATE COMMERCE—FEDERAL STATUTE—AMENDMENT
—CONSTRUCTION.

Act of Congress August 29, 1916, section 9, subd. c (39
U. S. Stat. at Large, p. 538), entitled "An act relating
to bills of lading in interstate and foreign commerce,"
amending and supplementing the interstate commerce
law relative to carrier's liability, commonly called the
"Carmack Amendment," making the initial carrier in
interstate transportation liable for through carriage to
point of destination under the bills of lading required
to be issued therefor, construed and *held*, not to restrict
or affect the rights of the parties connected with the
transaction as the law upon that subject previously stood.[1]

3. STATUTES — FEDERAL STATUTES — CONSTRUCTION BY FEDERAL
COURTS CONTROLLING.

State courts, when called upon to deal with Federal laws,
are governed by the construction given to them by the
Federal courts.

4. CARRIERS—BILL OF LADING—INITIAL CARRIER—LIABILITY.

Where a carload of potatoes was shipped over defendant's
line as the initial carrier, and was reconsigned by the
terminal carrier for further movement over another line
without authority of the assignee at the destination point,
or requiring surrender of the original bill of lading, con-
trary to instructions, defendant was liable, as a matter
of law, for any loss sustained by the shipper.

Error to Kent; Perkins, J.   Submitted October 15,
1918.   (Docket No. 53.)   Decided April 3, 1919.

Assumpsit by Jay F. French and another, copart-
ners as J. F. French & Co., against the Pere Marquette
Railway Company for breach of a contract of carriage.
Judgment for plaintiffs.   Defendant brings error.   Af-
firmed.

*Norris, McPherson, Harrington & Waer* (*Parker &
Shields*, of counsel), for appellant.

*Hall & Gillard*, for appellees.

STEERE, J.   This action was brought against de-

[1]See notes in 44 L. R. A. (N. S.) 257; 50 L. R. A. (N. S.) 819.

fendant as initial carrier to recover damages sustained by plaintiffs on a carload of potatoes shipped from Bailey, Mich., on November 3, 1917, over defendant's line and connecting carriers, to Louisville, Ky. The potatoes were intended for ultimate delivery at Camp Zachary Taylor, located near Louisville on the Southern railroad. After this camp was established the Southern road opened a station at that point, called Dumesnil, to handle the freight business which the camp demanded and developed. A firm named Marshall & Kelsey, of Indianapolis, Ind., had secured from the quartermaster of the camp a contract to supply it with a quantity of potatoes, and sublet a contract to a produce broker of Grand Rapids named Mosely to supply 40 carloads, of which plaintiffs, who were produce dealers and handled potatoes, furnished a part, the car in question being one of several which they shipped in that connection. The price of the potatoes to plaintiffs was $2.63 per hundredweight, less freight rate from Bailey to Indianapolis. The bill of lading, issued by defendant, shows it was N. Y. C. Car No. 151,473, containing 300 sacks of potatoes weighing 45,000 pounds, billed from Bailey, Mich.—destination Louisville, Ky., consigned to the order of J. F. French & Co.—route C. C. C. & St. L., often called the "Big Four." Upon the bill is the direction, "Notify Marshall & Kelsey, c/o Captain Bernard, Commissary at Camp Zachary Taylor," and "Allow inspection."

The car was moved under a standard uniform bill of lading, and a billing of like import accompanied the car showing routing, destination, consignee, etc. Defendant was the initial carrier and the Big Four railroad was both the connecting and terminal carrier. No claim of negligence is made as to time or manner of transporting the car over its route from point of shipment to Louisville, its destination and contracted point of delivery. Plaintiffs' grievance, and claimed

ground of negligence which resulted in the damages sought to be recovered, is a reconsignment of the car by the terminal carrier at Louisville for further movement over another line, without authority of the assignee at the destination point or requiring surrender of the original bill of lading for cancellation.

The trial court held that, as a matter of law, under the undisputed evidence, the terminal carrier was guilty of negligence in that particular and defendant liable for resulting damages, if any; and submitted to the jury the question of damages with proper instructions upon that issue, as to burden of proof, measure of damages if any were shown, etc. Plaintiffs recovered verdict with judgment thereon for $689.20.

Defendant's counsel properly saved adverse rulings desired reviewed by seasonable objections, motions, request for directed verdict, etc., and concisely point out in their brief that they center to a "narrow and well-defined" issue, saying:

"There is involved simply a construction of the Federal uniform bills of lading act passed in 1916 (39 U. S. Stat at Large, p. 538-542) in connection with the so-called Carmack amendment."

When the car was loaded and started from Bailey, its point of shipment, plaintiffs received from defendant, its initial carrier, the original order bill of lading covering this car, of the standard form approved by the interstate commerce commission, to which they attached a draft for the selling price drawn on Marshall & Kelsey of Indianapolis and turned it over to their local bank at Grand Rapids, receiving credit therefor on their commercial account and the bank forwarded the bill of lading with draft attached to the Commercial National Bank of Indianapolis for collection. As it turned out, the Indianapolis bank, in careless disregard of its duty as a collecting agent, handled the shipping bill in a way which made possi-

ble the complications which followed. Instead of requiring payment of the draft before surrendering the shipping bill to the payor, it detached the bill from the draft and intrusted it to Kelsey, who took it with other bills to Dumesnil, and, on about November 14th or 15th, left it at the Southern railroad station with one of its employees named Bindner who worked in the station as cashier. The agent of the Southern road at Dumesnil, named Baker, testified that he never had the bill of lading for that car and could not say that it was in the office, but the cashier had the same authority as he to deliver shipments. Bindner testified that he was not holding those bills for the Southern railroad company, but they were given to him by Kelsey, who had a whole lot of stuff in his pocket, to keep for him, and he (Bindner) "chucked them in a drawer" and was holding them for Kelsey. The car arrived at Louisville on November 9th and remained at the Big Four station until November 16th, when Bindner called up by 'phone the trackage clerk of the Big Four at Louisville, named Smith, told him he had the bill of lading and to let the car go out to the camp. Bindner testified that he did not do this under Kelsey's directions or as agent for the Southern railway but on his own hook because the car was overdue; he had looked at the routing which was over the Big Four and he knew the government needed potatoes. Smith testified that on receiving this word from Bindner he told him if the Southern railway would guarantee him "our car service" and he had the bill of lading, he would send it out and, although he knew that under the rules of the Big Four he should not let the car go without surrender of the bill of lading he "took the chance" and reconsigned the car by changing the destination in the way bill with charges to follow and sent it forward over the Southern railway line, which received and moved it under the altered way bill

marked "Dumesnil, Kentucky So. R. R.," delivering it at its destination on November 18th, charging a six cent local rate for the haul from Louisville to Dumesnil.

This car arrived at Louisville over the Big Four line on the evening of November 9, 1917. Kelsey had told Smith that he was stopping in that city at the Watterson hotel and asked to be notified by 'phone when cars, which he expected, arrived for his firm, and Smith on the next day (November 10th) first attempted to get him by 'phone, but being unsuccessful sent a regular form postal card notice by mail, addressed to the firm, care of the Watterson hotel, with a 5-day return mark on it, containing full information relative to the car and stamped across its face in large letters "Present Bill of Lading." Smith testified it was the rule of the company that a car billed as this one was should not be delivered without surrender of the bill of lading.

When the car arrived at Dumesnil it was placed on the side tracks near the commissary buildings and, as was shown against plaintiffs' objection, was subsequently rejected with numerous other cars on inspection by quartermaster officers, on what date does not appear, on the ground that the potatoes were suffering from "field frost," as diagnosed by Captain Hanson, while Col. Pearson stated that when his attention was called to them they were badly frost-bitten and rotten, and he directed Hanson to reject the cars from which they were taken; that as he recollected it the weather was extremely cold at that time and he could not tell whether they were frosted en route or in the field.

Bindner gave the original bill of lading back to Kelsey who returned it to the Indianapolis bank which reattached the draft to it, and returned it to plaintiffs' attorney who delivered it to them on December 7th. Plaintiffs' first notification of rejection of the car was

by a telegram Bindner sent to Mosely at Grand Rapids, Mich., on December 4th, telling him the car in question and certain others had been rejected, and Mosely informed plaintiffs of it on December 5th. The original bill of lading was then in possession of the Indianapolis bank with the draft. After the original order and draft were returned to plaintiffs they gave the Grand Rapids bank a check for the amount of the draft and surrendered the original order to defendant's division freight agent in exchange for a bill of lading reconsigning the car to plaintiffs at Memphis, Tenn., where the goods could be and were disposed of, to the best advantage, as is claimed, but at a loss, for recovery of which this action was brought.

Plaintiffs' contract was with Marshall & Kelsey, of Indianapolis, to whom they sold this carload of potatoes to be delivered at Louisville, Ky., with right of inspection at point of delivery. The right of the purchaser to examine the goods while in the hands of the carrier before accepting them was at the point of delivery only. There is nothing in the acts relied upon which restricts or affects the right of any of the parties connected with the transaction as the law upon that subject previously stood. The law relative to the effect of a "notify" clause in the bill of lading as heretofore settled in this jurisdiction and many others is well digested with numerous citations, as follows, in 10 C. J. p. 259:

"Where a bill of lading or a shipping receipt contains a clause providing that a third person shall be notified of the arrival of the goods, or where it contains this clause and an additional clause reciting that the goods are shipped to the consignor's order, the carrier is not authorized to treat the person to be notified as a consignee, and if it delivers the goods to him without production and surrender of the receipt or the bill of lading, it will be liable to the true owner of the goods for any loss resulting from such delivery."

This court has spoken definitely to that effect and emphasized the significance of a provision in the order bill of lading that its surrender properly indorsed shall be required before delivery of the consignment. *Perkett* v. *Railroad Co.*, 175 Mich. 253; *Turnbull* v. *Railroad Co.*, 183 Mich. 213; *Thomas* v. *Blair*, 185 Mich. 422; *Churchill* v. *Railway Co.*, 188 Mich. 376.

It is defendant's contention that these decisions are largely emasculated in their general import and become wholly inapplicable here by reason of the negotiable characteristics given a bill of lading by the act of congress passed August 29, 1916, to take effect January 1, 1917, entitled "An act relating to bills of lading in interstate and foreign commerce" (39 U. S. Stat. at Large, p. 538), construed in connection with the Carmack amendment of the interstate commerce act under which this action was brought. Counsel's position is pointedly stated in part as follows:

"The rules of ordinary contract law have absolutely nothing to do with this case because this case involves a negotiable instrument and not a contract of the common law. * * * Mr. Bindner, while he had possession of the bill of lading, exercised the authority which its mere possession conferred and obtained the car from the Big Four. Bindner by virtue of his possession (not ownership) of the bill of lading, was a person to whom the Big Four, the delivering and terminal carrier, was justified in making delivery of this car. The Big Four did make delivery of the car to Bindner while he was in possession of the bill of lading, and thereby did what it was authorized to do by section 9 of the bills of lading act."

That act, containing 45 sections, is in its nature related to and supplemental of the interstate commerce law, which, as enacted in 1887, underwent various amendments by the act of June 29, 1906 (34 U. S. Stat. at Large, p. 584, chap. 3591), especially as to section 20 relative to carrier's liability, commonly called the Car-

mack amendment, which made the initial carrier in interstate transportation liable for through carriage to point of destination under the bills of lading required to be issued therefor. The material concluding portion of that lengthy amendment of section 20 (of the 1887 act—section 7 of the 1906 act) is as follows:

"That any common carrier, railroad or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it or by any common carrier, railroad or transportation company, to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed: *Provided*, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law."

Section 9 of the act of 1916 relating to bills of lading, upon subdivision (*c*) of which defendant relies, is as follows:

"SEC. 9. That a carrier is justified, subject to the provisions of the three following sections, in delivering goods to one who is—

"(*a*) A person lawfully entitled to the possession of the goods, or

"(*b*) The consignee named in a straight bill for the goods, or

"(*c*) A person in possession of an order bill for the goods, by the terms of which the goods are deliverable to his order; or which has been indorsed to him, or in blank by the consignee, or by the mediate or immediate indorsee of the consignee."

The section immediately preceding (8) and three sections following (10, 11, 12) also relate to delivery, and so far as material are as follows:

"SEC. 8.  *  *  *  a carrier, in the absence of some

lawful excuse, is bound to deliver goods upon a demand made either by the consignee named in the bill for the goods, or, if the bill is an order bill, by the holder thereof, if such a demand is accompanied by—

"(*a*) An offer in good faith to satisfy the carrier's lawful lien upon the goods;

"(*b*) Possession of the bill of lading and an offer in good faith to surrender, properly indorsed, the bill which was issued for the goods, if the bill is an order bill; and

"(*c*) A readiness and willingness to sign, when the goods are delivered, an acknowledgment that they have been delivered, if such signature is requested by the carrier.

"In case the carrier refuses or fails to deliver the goods, in compliance with a demand by the consignee or holder so accompanied, the burden shall be upon the carrier to establish the existence of a lawful excuse for such refusal or failure.

"SEC. 10.   *   *   *   where a carrier delivers goods to one who is not lawfully entitled to the possession of them, the carrier shall be liable to any one having a right of property or possession in the goods if he delivered the goods otherwise than as authorized by subdivisions (*b*) and (*c*) of the preceding section; and, though he delivered the goods as authorized by either of said subdivisions, he shall be so liable if prior to such delivery he—

"(*a*) Had been requested, by or on behalf of a person having a right of property or possession in the goods, not to make such delivery, or

"(*b*) Had information at the time of the delivery that it was to a person not lawfully entitled to the possession of the goods.   *   *   *

"SEC. 11.   *   *   *   if a carrier delivers goods for which an order bill had been issued, the negotiation of which would transfer the right to the possession of the goods, and fails to take up and cancel the bill, such carrier shall be liable for failure to deliver the goods to any one who for value and in good faith purchases such bill, whether such purchaser acquired title to the bill before or after the delivery of the goods by the carrier and notwithstanding delivery was made to the person entitled thereto.   *   *   *

"Sec. 12.   *   *   *   if a carrier delivers part of the goods for which an order bill had been issued and fails either—

"(a) To take up and cancel the bill, or

"(b) To place plainly upon it a statement that a portion of the goods has been delivered with a description,   *   *   *   he shall be liable for failure to deliver all the goods specified in the bill to any one who for value and in good faith purchases it, whether such purchaser acquired title before or after the delivery of any portion of the goods by the carrier, and notwithstanding such delivery was made to the person entitled thereto."

These are Federal laws, for controlling interpretation by the Federal courts in their final analysis, and the State courts when called upon to deal with them are governed by the construction declared in decisions of those courts, where they have spoken. Counsel do not cite and we have not found any adjudication directly construing the provisions of the statute upon which defendant relies. The scope and purpose of the Carmack amendment, of which the later act is but supplemental, has frequently been before the United States Supreme Court for consideration of its various provisions. Its manifest purpose is, as interpreted by that court, to create in the initial carrier unity of responsibility for transportation to destination and bring contracts for interstate shipments under one uniform law, to which end a proper receipt, or bill of lading, must issue therefor.

"The liability of any carrier in the route over which the articles were routed, for loss or damage, is that imposed by the act as measured by the original contract of shipment so far as is valid under the act." *Kansas City Southern R. Co.* v. *Carl,* 227 U. S. 639 (33 Sup. Ct. 391).

In *Adams Express Co.* v. *Croninger,* 226 U. S. 491 (44 L. R. A. [N. S.] 257, 33 Sup. Ct. 148), holding

that a contract in a bill of lading relative to rates was not in violation of the act, the court said:

"The statutory liability, aside from responsibility for the default of the connecting carrier in the route, is not beyond the liability imposed by the common law as that body of law applicable to carriers has been interpreted by this court as well as many courts of the States."

In view of the history of the interstate commerce law, its administration and the many decisions of both Federal and State courts recognizing certain of its features as but declaratory of common-law principles, it is wide of the mark to assume that because enacted into statute the rules of the common law have nothing to do with this inquiry. This order bill of lading under which the shipment was made, while now negotiable under the act of 1916, possessed those attributes in like degree and had often been recognized as such by the courts years before the act was passed. That act, which counsel in their briefs designate the "Uniform bills of lading act," nowhere in express language, either in its title or body, prescribes a form for or even mentions a uniform bill of lading. As "An act relating to bills of lading in interstate and foreign commerce," its subject-matter is suggestive of the name and instructive of its purpose in the particular that many of its provisions and requirements harmonize with and follow in general plan the standard uniform bills of lading which the interstate commerce commission had approved as such and which, by years of use, had become familiar to commerce. Those forms, after careful consideration in the light of experience, had been approved by the commission and adopted by shippers and carriers, without direct legislation therefor, to meet the general requirements of the Carmack amendment. In practical application, as the law was administered by the commission and inter-

preted by the courts, they had through years of trial and test apparently proved satisfactory and efficient for conduct of the gigantic and complicated business of interstate and foreign transportation. It is fairly inferable that the intent of this act was to strengthen by legislative indorsement that which had for efficient administration of the interstate commerce law been worked out, adopted, and approved by the combined efforts of shippers, carriers, and the interstate commerce commission.

If it was the purpose of the act to impose limitations on these long used and often construed bills of lading to an extent which changed the settled law in the important particular claimed, it would seem that, in the absence of a prescribed form and in view of the context, a clearer declaration than that relied on would be found somewhere in the act.

The form of order bill of lading used by defendant in this case and delivered to plaintiffs, stating in bold type on its face that its surrender properly indorsed "shall be required before the delivery of the property," is the prescribed form set out at length in connection with the opinion and order of approval thereof filed by the interstate commerce commission after full hearing, on June 27, 1908 (14 Interstate Commerce Commission Rep. 346). Two forms are there recognized, as also in this act. An order bill of lading though negotiable represents property, not money, and the certainty of its surrender before delivery of the property it describes is a matter of serious significance in financing consignments for transportation, as pointed out by Judge Knapp, chairman of the commission, in the portion of the opinion discussing the two approved forms of bills of lading, as follows:

"The main point in this connection is that the 'order' bill will possess a certain degree of negotiability, while the 'straight' bill will be nonnegotiable and is to be

so stamped upon its face. Moreover, and this is a matter of consequence, the order bill of lading will be required to be surrendered upon or before the delivery of the property to the consignee. It is believed that this plan will in large part meet the requirements of the banking concerns of the country which advance vast sums of money upon bills of lading and are entitled to a reasonable measure of protection."

Section 8 of the act under consideration affords the carrier full protection by refusing delivery of the property when demanded by the consignee or holder of an order bill of lading, unless possession of the same properly indorsed thereon is surrendered.

Section 42 of the act specifies that "unless the context of the subject-matter otherwise requires, * * * 'holder' of a bill means a person who has both actual possession of such bill and a right of property therein." That definition clearly did not fit Bindner who had no right of property nor interest in the bill, nor control of it or right of possession beyond its safe keeping, for Kelsey, which accommodation trust he executed by "chucking" it with other papers into a drawer and handing it back when called for, in the meantime, however, on his "own hook" without instructions from any one telling Smith, who neither saw nor asked for the order, that he had it, with the results before detailed. But, eliminating him as a "holder" under the strict statutory definition, it may be conceded that nevertheless, under subdivision (*c*) of section 9 he was entitled to delivery of the shipment as a person in possession of the order bill indorsed in blank by the consignee. Defendant in fact did not deliver the goods direct to him but turned them over by an irregular reconsignment to another carrier on the strength of his statement that he had the bill, without asking for it or even seeing it, in admitted violation of its own rules and of the distinct provision on the face of the order bill under which it had received the consign-

ment, that its surrender should be required before delivery. By statute the carrier is made liable for the acts of its agents. The act nowhere prescribes the form of shipping bill which should be used nor in express language forbids that used here, and generally. Resorting to context to determine the intent of subdivision (c) of section 9 in the connection used, especial importance is given to surrender of the order for cancellation on delivery, for protection of the carrier, both in preceding and following provisions, read in connection with which it may be fairly inferred, taking all the related provisions together, that when a person in bare possession of the bill, not shown or known to have any actual interest or right of property therein, demands delivery of the goods, the carrier is only justified in complying on surrender of the bill to it; or, at least, as tinctured by the context and in view of the general purpose of the act, the provision relied on is not to be construed as prohibitive of a contract requirement in the order bill of lading issued by the carrier to that effect.

Other points raised and discussed have not been overlooked, but regarding the controlling question, as stated by defendant's counsel, to be the construction of the act of 1916 in connection with the Carmack amendment, and agreeing with the construction, as applied to the facts in this case, by the trial court, we find no occasion to disturb the judgment, which is therefore affirmed.

BIRD, C. J., and OSTRANDER, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.