(March 22, 1921.)

## L. A. RICE, Respondent, v. OREGON SHORT LINE RAILROAD COMPANY, a Corporation, Appellant.

[198 Pac. 161.]

CARRIERS — CARMACK AMENDMENT — INITIAL CARRIER — NEGLIGENCE—
ACT OF GOD.

1. Under the Carmack Amendment, liability of a carrier for damages as initial carrier depends upon the reception of goods in one state for transportation to a point in another state or territory, rather than the intention which the shipper may have had at the time of loading the cars but which does not find expression in some form of contract; and where all the obligations of a previous contract of shipment are terminated, and there has been a delivery to the consignee prior to the making of the subsequent contract for shipment into another state, the carrier receiving the property under the subsequent contract of shipment is the initial carrier.

2. The distinguishing characteristic of an "act of God" is that it proceeds from the forces of nature alone, to the entire exclusion of human agency.

3. When an act of God is relied upon as a defense in an action for damages, it is not sufficiently accurate to instruct the jury that a natural event is an act of God if it be not reasonably anticipated, since the reasonableness of the anticipation in such cases is not to be tested by ordinary standards.

4. A carrier is liable for damages proximately caused by an act of God, in case its failure to use reasonable diligence to prevent or mitigate the damage contributes to the loss.

1. Liability of initial carrier of goods under Carmack Amendment, see notes in Ann. Cas. 1915B, 80; Ann. Cas. 1917C, 939.

Carmack Amendment as affecting state regulations as to stipulations limiting liability of common carrier for the loss or damage to goods, see notes in 44 L. R. A., N. S., 257, and 50 L. R. A., N. S., 819.

4. Co-operation of act of God with negligence of carrier as affecting carriers' liability for damages, see notes in 3 Ann. Cas. 453; 12 Ann. Cas. 449; Ann. Cas. 1912D, 968; Ann. Cas. 1918A, 581.

APPEAL from the District Court of the Third Judicial District, for Ada County. Hon. Charles P. McCarthy, Judge.

Action for damages. Judgment for plaintiff. *Affirmed.*

H. B. Thompson and John O. Moran, for Appellant.

Manifestations of nature, including· weather conditions or snowstorms which are so unusual as not to be reasonably anticipated, fall within the definition of "act of God." (*Willson v. Boise City,* 20 Ida. 133, 117 Pac. 115, 36 L. R. A., N. S., 1158.)

A common carrier which receives goods intended for shipment from a point in one state to a point in another state is the initial carrier, although it only switches the car in which they are loaded to the lines of another common carrier to be transported out of the state. (*Barrett v. Northern Pac. R. Co.,* 29 Ida. 139, 157 Pac. 1016; *United States v. Union Stock Yards & Transit Co.,* 226 U. S. 286, 33 Sup. Ct. 83, 57 L. ed. 226, see, also, Rose's U. S. Notes.)

It is the essential character of the commerce, not the accident of local or through bills of lading, which determines federal or state control over it and the liability of the initial carrier. It takes character as interstate or foreign commerce when it is actually started in the course of transportation to another state or to a foreign country. (*Railroad Commission of La. v. Texas & Pac. R. Co.,* 229 U. S. 336, 33 Sup. Ct. 837, 57 L. ed. 1215; *Texas & New Orleans R. Co. v. Sabine Tram Co.,* 227 U. S. 111, 33 Sup. Ct. 229, 57 L. ed. 442; *Southern Pac. Terminal Co. v. Interstate Commerce Commission,* 219 U. S. 498, 31 Sup. Ct. 279, 55 L. ed. 310, see, also, Rose's U. S. Notes; *Bracht v. San Antonio & A. P. R. Co.,* 254 U. S. 489, 41 Sup. Ct. 150, 65 L. ed. ——.)

The initial carrier of a shipment in interstate commerce is liable for the default of all connecting carriers to destination, even while the goods are being transported under

an exchange bill of lading issued without its knowledge or concurrence. (*Atchison & Topeka & S. F. R. Co. v. Harold*, 241 U. S. 371, 36 Sup. Ct. 665, 60 L. ed. 1050, see, also, Rose's U. S. Notes.)

The intention of the shipper as to the ultimate destination at the time the freight starts is the test of its character, regardless of whether the voyage is temporarily broken, whether more than one carrier transports it, or whether it moves on through or local bills of lading. (*United States v. Illinois Cent. R. Co.*, 230 Fed. 940.)

Hays, Martin, Cameron & Hays, for Respondent.

An initial carrier is not liable for damages to goods occurring on lines not its own and over which they were routed without notice to it. The obligation of such a carrier ceases when the goods reach the destination, in good condition, to which they were originally consigned. (*Parker-Bell Lumber Co. v. Great Northern R. Co.*, 69 Wash. 123, 124 Pac. 389, 41 L. R. A., N. S., 1064; *Barrett v. Northern Pac. Ry. Co.*, 29 Ida. 139, 157 Pac. 1016; *Quillen v. Minneapolis & St. L. R. Co.*, 181 Iowa, 536, 164 N. W. 779; *Knapp v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 33 N. D. 291, 156 N. W. 1019; *Victor Produce Co. v. Western Transit Co.*, 135 Minn. 121, 160 N. W. 248.)

Whether the Boise & Interurban Electric Railway received plaintiff's sheep "for transportation from a point in one state to a point in another state," or whether the defendant Oregon Short Line Railroad was the first to receive plaintiff's sheep "for transportation from a point in one state to a point in another state," and thus became the so-called "initial carrier" or the carrier meant to be held liable under the Carmack Amendment, was a question of fact for the jury. (*Produce Trading Co. v. Norfolk So. R. Co.*, 178 N. C. 175, 100 S. E. 316; *Southern Pac. Co. v. Arizona*, 249 U. S. 472, 39 Sup. Ct. 313, 63 L. ed. 713.)

The mere intention of respondent Rice, if such existed, to ultimately continue his journey beyond the state did not

convert the intrastate shipment from Linder to Caldwell into one that was interstate. (*Southern Pac. Co. v. Arizona, supra; Gulf, C. & S. F. R. Co. v. Texas,* 204 U. S. 403, 27 Sup. Ct. 360, 51 L. ed. 540, see, also, Rose's U. S. notes; *Settle v. Baltimore & O. S. W. R. Co.,* 249 Fed. 913, 162 C. C. A. 111.)

The fact that the sheep were not unloaded at Caldwell but were reshipped to Chicago in the same cars does not render the transportation from Linder to Caldwell interstate commerce nor does it prevent the appellant from being the first carrier to receive the sheep ''for transportation from a point in one state to a point in another state'' under the contract here sued on. (*Chicago M. & St. P. Ry. Co. v. Iowa,* 233 U. S. 334, 34 Sup. Ct. 592, 58 L. ed. 988, see, also, Rose's U. S. Notes; *Houston E. & W. T. Ry. Co. v. Houston Packing Co.* (Tex. Civ.), 221 S. W. 316; *Bracht v. San Antonio & A. P. Ry. Co.,* 254 U. S. 489, 41 Sup. Ct. 150, 65 L. ed. ——; *Chesapeake & O. Ry. Co. v. National Bank of Commerce of Norfolk,* 122 Va. 471, 95 S. E. 454; *Louisville & N. R. Co. v. Johnson,* 182 Ky. 418, 206 S. W. 638; *Pere Marquette Ry. Co. v. J. F. French & Co.,* 254 U. S. 538, 41 Sup. Ct. 195, 65 L. ed. '——.)

RICE, C. J.—This action was commenced against appellant as the initial carrier under the Carmack Amendment (U. S. Comp. Stats. 1916, secs. 8604a, 8604aa) for damages alleged to have been suffered on account of negligent handling of four cars of sheep. At the trial, respondent introduced no evidence of negligence on the part of appellant for damages resulting from any act or omission on its part. The negligence for which respondent claimed damages was that of the Union Pacific Ry. Co., a connecting carrier. Appellant, therefore, cannot be held liable in this case unless it is the initial carrier under the Carmack Amendment.

It appears that the sheep were loaded on the cars at Linder, a station on the Boise and Interurban Railway, on February 17, 1914. There being no station agent at Linder, a bill of lading was issued by the conductor of the train which carried the sheep. The bill of lading showed the destination of the shipment to be Caldwell, a station also on the line of the Boise and Interurban Railway Co., the sheep being consigned to the shipper, respondent herein. The line of the interurban company is wholly within the state of Idaho. On arrival at Caldwell, a transfer of the cars containing the sheep was made from the line of the interurban railroad to that of appellant. Respondent paid the freight charges to the agent of the interurban company at Caldwell, signed a receipt and surrendered the bill of lading, and thereafter entered into the contract of shipment with appellant which is made the basis of this action.

It was shown by the evidence that the Boise and Interurban Railway Co. had not filed with the Interstate Commerce Commission any tariffs or schedule of rates previous to the time of this shipment; also that its policy was at the time of this shipment, and had previously been, not to make contracts to ship property from points on its line to points outside the state.

According to the bill of lading issued by appellant, the sheep were consigned to Rosenbaum Bros., a corporation, at Chicago, Ill., and were routed over the line of appellant, U. P. Ry., and Chic. Mil. & St. P. Ry. They were thereafter diverted to So. Omaha, Nebr.

When the sheep were loaded at Linder, respondent expected to send them to an eastern market in case he did not sell them en route. The general freight agent of the Boise and Interurban Railway Co. testified that he knew when he provided the cars that the prospect was the sheep would move outside of the state of Idaho.

In the case of *Barrett v. Northern Pacific Ry. Co.*, 29 Ida. 139, 157 Pac. 1016, this court said:

"The agreement between appellant and respondents, prior to the arrival of the goods in Spokane, whereby they were to be transmitted from that city to Rupert constituted a new contract entirely separate and independent of that entered into with the Chicago, Burlington & Quincy Railroad Company and one to which that company was not a party. An initial carrier is not liable for damage to goods occurring on lines not its own and over which they were routed without notice to it. The obligation of such carrier ceases when the goods reach the destination, in good condition, to which they were originally consigned. (*Parker-Bell Lumber Co. v. Great Northern R. Co.*, 69 Wash. 123, 124 Pac. 389, 41 L. R. A., N. S., 1064.)"

In the case of *Houston E. & W. T. Ry. Co. v. Houston Packing Co.* (Tex. Civ.), 221 S. W. 316, the court said: " . . . . the only question presented in this court being, Which one of the two railroads, the I. & G. N. R. R. Co. or the appellant, under the facts in evidence, was the initial carrier of the shipment within the meaning of the Carmack Amendment to the Interstate Commerce Act (U. S. Comp. Stats., secs. 8604a, 8604aa; 4 Fed. Stats. Ann., 2d ed., pp. 506, etc.)? . . . .

"The bill of lading bore date March 16, 1916, and was therefore issued by the appellant on the same day the car was loaded by the I. & G. N. Railway Company and the day before it was delivered by the I. & G. N. Ry. Company at its own yards to the appellant company. It will be further noted that the I. & G. N. did not receive this shipment under any contract of interstate carriage, the limit of its agreement and undertaking, pursuant to the rules and regulations of the Texas Railway Commission, being to switch all cars loaded on its line to the yards of the H. E. & W. T., and there deliver them to it. The only contract here appearing was the one made by the packing company with the appellant, and evidenced by the bill of lading, by which the latter agreed to transport the car through from Houston to its destination in Massachusetts.

"We think these facts constituted the appellant company the 'initial carrier,' as that term is used in the Carmack Amendment, and that the courts have settled the question in favor of this view."

In the case of *Baltimore & Ohio Ry. Co. v. Montgomery & Co.,* 19 Ga. App. 29, 90 S. E. 740, the court held that under the evidence adduced, the only contract made was by the defendant company as represented by its bill of lading under which the shipment moved from Moorefield, W. Va., to Atlanta, Ga. But in order to make its position clear, the court said:

"If the defendant, or its connection, had delivered the shipment at Richmond, demanded a surrender of its bill of lading, there collected the freight charges due it, and thereafter a new bill of lading had been issued for the shipment from Richmond, Va., to Atlanta, then there would have been a new shipment, and the railroad issuing this second bill of lading at Richmond would have been the initial carrier of the shipment from Richmond to Atlanta."

The question presented in this case arises under and involves a construction of a law of the United States. The latest expressions of the supreme court are found in the cases of *Bracht v. San Antonio & Ark. Pass. Ry. Co.,* 254 U. S. 489, 41 Sup. Ct. 150, 65 L. ed. ——, and *Pere Marquette Ry. Co. v. I. F. French & Co.,* 254 U. S. 538, 41 Sup. Ct. 195, 65 L. ed. ——

In the first of these cases it appears that the shipper delivered to respondent railroad company at Ingleside, Texas, a carload of vegetables consigned to himself at Dallas, Texas, a point off its lines, where he intended to sell them. The car moved over respondent's road to Waco, and then over the M. K. & T. Ry. to Dallas. Upon the petitioner's request, made after such arrival, the M. K. & T. Ry. forwarded the car to Kansas City over its own lines, took up the original bill of lading and issued an interstate one, acknowledging receipt of the vegetables at Dallas. The court said:

"The general principles announced in *Gulf, C. & S. F. R. Co. v. Texas,* 204 U. S. 403, 411, 27 Sup. Ct. 360, 51 L. ed. 540, 545, are applicable. *Railroad Commission v. Worthington,* 225 U. S. 101, 32 Sup. Ct. 653, 56 L. ed. 1004; *Texas & N. O. R. Co. v. Sabine Tram Co.,* 227 U. S. 111, 33 Sup. Ct. 229, 57 L. ed. 442, and similar cases are not controlling. They involved controversies concerning carriage between points in the same state which was really but part of an interstate or foreign movement reasonably to be anticipated by the contracting parties,—a recognized step toward a destination outside the state. The distinctions are elucidated in *Texas & N. O. R. Co. v. Sabine Tram Co.* Here neither shipper nor respondent had in contemplation any movement beyond the point specified, and the contract between them must be determined from the original bill of lading and the local laws and regulations."

In the case of *Pere Marquette R. Co. v. J. F. French & Company,* it appears that French & Company shipped a carload of potatoes from Bailey, Mich., to Louisville, Ky., by the Pere Marquette Railroad as initial carrier and the Big Four Railroad as connecting and terminal carrier. The shipment was made on a "consignor's order" bill of lading in the standard form, by which the car was consigned to the shipper's order at Louisville, and upon the bill of lading there was a notation, "Notify Marshall & Kelsey, c/o Capt. Bernard, Commissary, Camp Taylor." It appears that Camp Zachary Taylor was located about six miles from Louisville, on the Southern Railroad, near Dumesnil station. Marshall & Kelsey had contracted with the government to supply a large quantity of potatoes at this camp, and had made a contract of purchase with French & Company. The car in question was shipped to Louisville, to be applied on these contracts.

By stating the facts thus, we understand the supreme court to accept as a fact the statement of the Michigan supreme court (*French v. Pere Marquette Ry. Co.,* 204 Mich. 578, at p. 580, 171 N. W. 491), to the effect that the

potatoes were intended for ultimate delivery at Camp Zachary Taylor, located near Louisville on the Southern Railroad. Upon arrival of the shipment at Louisville, the Big Four Railroad, without requiring a surrender of the bill of lading, released the car, changed the waybill so as to provide for delivery of the car at Dumesnil and turned it over the Southern. The court said:

"Whatever name be used in referring to the act of forwarding the car, the Big Four, when it surrendered possession of the car to the Southern at Binder's request, terminated its relation as carrier; just as it would have done if, at his request, it had shunted the car on to a private industrial track, or had given the control of it to a truckman on the team tracks. Having brought the goods to the destination named in the bill of lading, the carrier's only duty under its contract was to make a delivery at that place; and it could make that delivery by turning the goods over to another carrier for further carriage. Compare *Bracht v. San Antonio & A. Pass. R. Co.,* decided by this court January 3, 1921, 254 U. S. 489, 41 Sup. Ct. 150, 65 L. ed. ——; *Seaboard Air-line R. Co. v. Dixon,* 140 Ga. 804, 79 S. E. 1118; *Melbourne v. Louisville & N. R. Co.,* 88 Ala. 443, 6 So. 762. The fact that, in forwarding the car, the Big Four used the original waybill, striking out the word 'Louisville' under the 'destination' and substituting 'Dumesnil,' Ky., So. R. R., is of no significance. The shipment from Louisville to Dumesnil was a wholly new transaction. In turning over the car for this new shipment, the railway made a disposal of it in assumed termination and discharge of its obligations, which was, in legal contemplation, a delivery."

The decision in the case last above cited, following so closely in point of time that announced in the Bracht case, it is evident that the opinions in the two cases were intended to be in entire harmony. In the French case it is held that although it appeared that when the car was shipped at Bailey, Mich., it was intended for ultimate

delivery at Camp Zachary Taylor, the turning over of the car at Louisville by the Big Four for the new shipment in "assumed termination and discharge of its obligations," constituted a delivery, and that the shipment from Louisville to Dumesnil was "a wholly new transaction."

We conclude that liability for damages as an initial carrier depends upon the reception of the goods in one state for transportation to a point in another state or territory, rather than the intention which the shipper may have had at the time of loading the cars but which does not find expression in some form of a contract, and that where all the obligations of a previous contract of shipment are terminated, and there has been a delivery to the consignee prior to the making of a subsequent contract for shipment into another state, the carrier of the property under the subsequent contract of shipment is the initial carrier under the Carmack Amendment. In this case appellant was the initial carrier. (*Gulf C. & S. F. R. Co. v. Texas,* 204 U. S. 403, 27 Sup. Ct. 360, 51 L. ed. 540, see, also, Rose's U. S. Notes; *Southern Pac. Co. v. Arizona,* 249 U. S. 472, 39 Sup. Ct. 313, 63 L. ed. 713. See, also, *Chesapeake & O. Ry. Co. v. National Bank of Commerce,* 122 Va. 471, 95 S. E. 454.)

The court submitted the question as to who was the initial carrier to the jury, and respondent cites in support of the court's action the cases of *Southern Pac. Co. v. Arizona, supra,* and *Produce Trading Co. v. Norfolk So. Ry. Co.,* 178 N. C. 175, 100 S. E. 316. Those cases contain nothing inconsistent with treating the question as one of law, where bills of lading are clear and unambiguous and where the facts are undisputed as they are in this case. The jury, however, found as a fact that appellant was the initial carrier.

Error was predicated upon the action of the trial court in permitting the witness Cox to testify that the Boise and Interurban Ry. Co. had not filed tariffs with the Inter-

state Commerce Commission. This evidence only related to the question as to whether or not appellant was properly sued as initial carrier in this case, and we think it was properly received.

Appellant claims the court erred in permitting respondent to testify that the yardmaster at Laramie had agreed to put him in Valley in twenty-three hours. The complaint does not allege a breach of any such agreement as a basis for damages, and it does not appear that evidence was introduced or received for the purpose of establishing such agreement. It only had bearing on the question of the negligent handling of the shipment in connection with respondent's demand that the sheep be not unloaded at Laramie but carried to Cheyenne for feeding. We do not think the reception of the evidence was prejudicial to appellant.

Appellant assigns as error the refusal of the trial court to give its requested instruction No. 8, as follows:

"You are instructed that when weather conditions arising during transit are so unusual as not to be reasonably anticipated they come within the meaning of the expression known as 'act of God.' You are further instructed that a carrier is not liable or responsible for damages or results which could not have been reasonably anticipated, nor for injury or damages occurring as a result of an 'act of God,' nor is a carrier liable for damages or injury to animals resulting from their natural propensities or inherent nature. You are therefore instructed that no damages can be awarded against the defendant for any injuries or damages falling within the above definitions, and unless you can say from the evidence that the plaintiff has suffered damages from other causes and due to the negligence of the carriers it is your duty to render a verdict in favor of the defendant."

The difficulty of framing an abstract definition of the expression "act of God" is recognized. It is doubtful

·whether a reasonable anticipation of a natural event is a necessary element in such a definition. The distinguishing characteristic of an "act of God" is that it proceeds from the forces of nature alone, to the entire exclusion of human agency. As applied to the law of negligence, when an act of God is relied upon as a defense, it is not sufficiently accurate to state that a natural event is an act of God if it be not reasonably anticipated. Reasonable anticipation requires further definition. In the case of *Willson v. Boise City*, 20 Ida. 133, 117 Pac. 115, 36 L. R. A., N. S., 1158, on which appellant relies, it is suggested: "If it appeared in this case that this was such a heavy and unprecedented rainfall as had not occurred within the memory of man, as that term is defined by law, then certainly the city would not be liable. Such an act would properly be classed as the act of God for which there is no liability."

The proposed instruction might also be misleading in that a carrier is liable for damages proximately caused by an act of God, in case its failure to use reasonable diligence to prevent or mitigate the damage contributes to the loss. (*Illinois Cent. R. Co. v. Kuhn,* 107 Tenn. 106, 64 S. W. 202.)

The court instructed the jury as follows:

"By the term, 'act of God,' is meant those events and accidents which proceed from natural causes, and cannot be anticipated and guarded against, or resisted; such as unexampled freshets, violent storms, lightning and frosts. For losses occurring by any of these means, a common carrier is not liable; provided it has not been guilty of want of ordinary and reasonable care to guard against such loss."

We do not think the court erred in refusing to give the instruction proposed, and instead thereof giving the instruction last above quoted. Whether or not the court's definition of the term "act of God" is entirely accurate, it is sufficiently so and is not misleading.

We do not consider the other specifications of error to be meritorious.

The judgment is affirmed.   Costs awarded to respondent.

Budge, Dunn and Lee, JJ., concur.

McCarthy, J., deeming himself disqualified, did not sit at the argument nor take part in the opinion.

Petition for rehearing denied.